Shimer *v.* Bangor Gas Company (et al., Appellant).

Argued January 15, 1963. Before MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Raymond J. DeRaymond,* with him *Coffin, Grifo & DeRaymond,* for appellant.

*John C. Hambrook,* with him *Fox, Oldt & Hambrook,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 19, 1963:

On August 11, 1961, Mrs. Donald Riley, living at 425 William Street in the Borough of Pen Argyl, smelled gas, always an ominous sign because gas being an inflammable and explosive substance, is supposed at all times to be imprisoned within containers which prevent its odors from being released into the open air. She cautiously made an investigation in her house and found nothing which would explain the sinister symptom. The next morning at 6 o'clock she opened the door leading into the cellar and was struck by an even stronger emanation than the one she had smelled the night before. Hastily closing the door, she made an attempt to call the Bangor Gas Company, which supplied the gas for her house.

She was unable to reach anyone at the gas company offices until 8:30, at which time she reported the gas leak and urged that someone be sent to her place at once to check conditions. The operator, who took the report rather casually, suggested she call one of two other numbers. The person answering at one of

the numbers given by the bored operator said with the same casualness Mrs. Riley had encountered at the gas company's office that he was not on duty but that she might call the second number given her by the gas company. The person answering at the second number said that this was indeed the home of a gas inspector, Edwards by name, but that he was not at home. Mrs. Riley related to this person at the second number the hovering menace in her dwelling, whereupon, with the same nonchalance which had characterized the languid girl at the gas company's switchboard and the uninterested person answering the first number, this person at the second number said that Edwards might be returning home for lunch, and if so, she would tell him that Mrs. Riley had called. In the meantime Mrs. Riley's home was filling with more detonating gas.

Eventually, at about 11:55 a.m., a man called Edwards appeared at Mrs. Riley's home, and in self-identification, called out that he was the "gas man." He entered into the kitchen, as he later testified, and smelled gas "right away." He descended into the unilluminated cellar, being careful, as he subsequently described the event, not to turn on the electric light switch because "there was too much gas," and even snapping the switch might create a spark which would ignite the explosive compound. Continuing his extreme vigilance and caution he went out to his truck to pick up a flashlight with which he could reconnoiter through the dark because a flashlight produces no flame, spark or scintilla which could cause an explosion. However, he discovered that he had failed to bring along a flashlight and so returned to the house, this time entering through the cellar door.

He could not see his way around because of the wholly enveloping gloom. He reflected on the situation and then arrived at the conclusion that since he

could not turn on the electric light because this might instantaneously precipitate an explosion, he would find his way around by lighting a match. And that is what he did.

He was asked at the trial: "What happened when you lit the match?"

His reply was "One awful boom."

He got out of the hospital eight weeks later.

As the result of this "boom", the house of Harry V. Shimer, the plaintiff in this case, who lived next door at 427 William Street, was demolished. He brought suit in trespass against the Bangor Gas Company and the Kirk Construction Company, allegedly responsible for the gas leak. The jury returned a verdict against both defendants. The Kirk Construction Company appealed to this Court for judgment n.o.v., maintaining that the evidence did not establish that it was responsible for the leak and that, in any event, the act of Edwards in striking the catastrophic match was an intervening and superseding act which relieved the Kirk Company from liability for any resulting damages.

The Kirk Company, which had been engaged in installing a sewer system in Pen Argyl, was, on August 11, 1961, excavating ditches for sewer laterals in the 400 block of William Street. Sometime during that day, a Mrs. Knecht said to one of the Kirk employees that she smelled gas. The Kirk foreman informed her that what she was smelling was the newly turned earth. The next day, when the catalytic Edwards appeared on the scene, the ensuing eruption proved that her olfactory sense was more reliable than that of the Kirk foreman.

After the explosion, it was observed that the service line leading to the Shimer house had become separated from the gas main at the point of connection. What had caused this separation? The Bangor Gas Com-

pany, which resisted in the court below the motion of the Kirk Construction Company for judgment n.o.v., and continues to resist it here, argues that the jury was justified in concluding that in excavating earth in front of the Shimer house, one of the machines being used by the Kirk Company damaged the gas line. It was shown at the trial that at 10:55 a.m., on August 11, 1961, the gas pressure in Bangor's main had dropped from a normal of $7\frac{1}{2}$ to 8 inches to 6.8 inches and as low as 6.3 inches. This significant drop in pressure would be consistent with a break of the service line on William Street. The lower court pointed out in its Opinion affirming the jury's verdict: "The service line pipe was bent at a point close to the main and 'in the locality of the arched position' was a 16 inch boulder. The earth in the immediate vicinity of the break was lighter in color than the surrounding earth which escaped from the break. The area of this burned ground would have been enlarged if the break had preexisted for more than three days prior to the explosion."

The Kirk Company maintains that there is no direct evidence that it broke the gas line, arguing that the only evidence in this case is circumstantial. It has been demonstrated in myriads of cases that circumstantial evidence can be as revealing, under certain conditions, as the testimony of on-the-spot witnesses, especially when the concrete realities are not disputed. Irrefutable circumstances are like bricks, and, when they join, one with another, to form a solid wall of fact, inseparably wedded by the mortar of nature's laws and inevitable cause and effect, the resulting barrier excludes fanciful hypotheses, airy guesses and uncontrolled imaginings as to how a given event occurred.

The lowering of the gas pressure, the discoloration of the earth at the point of the excavation, the smell

of gas in that immediate area, all coinciding in time, combined to form a formidable arrow of accusation which pierced and shattered the feeble shield of theory raised by the defendant Kirk. The jury was not only justified, but was practically ordered by the law of physics to reach the conclusion at which it arrived, with regard to the responsibility of Kirk for the pipe breakage which filled the Riley and Shimer houses with potential explosion.

The Kirk Company then argues that, even if it did negligently tear the service line from the gas main, its act of negligence spent itself with that untoward happening, and it was not responsible for the disaster which followed because of what the preoccupied Edwards did.

It argues that Edwards' act was an intervening and superseding cause of negligence which "would insulate the negligence, if any, of Kirk Construction Company." Section 447 of the Restatement of Torts, declares: "The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal response to a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

The appellant argues that under this section, it should not be held liable because it could not have realized that the gas company employee would light a match. But actionable foreseeability was not limited

to the gas company employee striking a match. Others may have struck a match. There were many foreseeable acts which could equally have detonated the gas-charged atmosphere. The throwing of an electric switch before the thrower could have had time to note the presence of gas might have caused the same demolition which resulted from the act of the woolgathering Edwards.

Once a tortfeasor releases a destructive agency, he is responsible for the damage which follows as long as that destructive force remains at loose and is uncurbed. A circus attendant who allows a tiger to escape from its cage into the streets may not plead nonliability if a passerby, in fright and panic, runs into the path of the tiger instead of seeking refuge in some building or other available shelter.

In *Thornton v. Weaber,* 380 Pa. 590, the plaintiff's decedent was killed when he came into contact with a cable which had been electrified when a truck hit and knocked over a utility pole 150 feet away. The defendant, whose truck had demolished the utility pole, maintained that it could not be liable for the fatal accident because the circumstances attendant upon the death constituted superseding cause. This Court, in rejecting this proposition, said:

"The defendant contends that when the truck came to the end of its journey, upside-down and probably irreparably damaged, the negligence of its driver, Nelson N. Weaber, had terminated and that therefore his estate is not liable for what happened to Richard Thornton following the wreck. This contention assumes that a stream of fault loses its identity once it enters into a gulf of subsequent circumstance. Such an assumption does not accord with reality. An original fault carries as far as its aggressive quality influences the movements of those who come within the boundaries of its unspent force. The chain of causation

can, of course, be broken by intervening events, but it does not snap merely because of the passage of time or interposition of distance. . . .

"When Nelson Weaber's wrongful act felled the utility pole and severed the high tension wires, it breached the walls of the reservoir of electricity, releasing its mortal fire to strike down all those within its reach. Whether the tongue of destruction caught its victim 150 feet away or a mile away is not controlling as to legal responsibility for the damage done. . . .

"The immediate cause of Richard Thornton's death was, of course, his passing over the charged cable. But this movement was the result of the defendant's wrongful act in cutting the tension wire. Thornton's death would not have happened had the truck not negligently left the highway. The breaking of the high tension wire was the proximate although not the immediate cause of the fatality which followed. The law is not so unaware of reality that it will permit a tortfeasor to turn his wrongful act into an immunity by asserting that the eventual damage resulted from a more immediate cause when it is clear that this immediate cause was put into operation by his own tortious conduct."

The lower court cited, in support of its ruling, the case of *Darrah v. Wilkinsburg Hotel Company*, 318 Pa. 511. The appellant seeks to distinguish that case from the instant one. There, the hotel-owner defendant installed a flower box at the edge of a balcony overlooking a ballroom. An onlooker placed his foot against the box as a rest, and the box toppled to the floor below, injuring the plaintiff. The Court held the hotel-owner defendant liable. The appellant here argues that that case differs from the one at bar in that there the intervening third party was an innocent intervenor. There is nothing, however, in the Court's opinion in

that case which can be interpreted as holding that if the intervenor had been negligent himself in some manner, that his act would have immunized the hotel-owner from liability. The setting of a dangerous situation which may be triggered, negligently or innocently, to the harm of a third person is the basic tortious act, and the original tortfeasor may not escape liability by emphasizing the negligence of the second tortfeasor, as the appellant does here.

Judgment affirmed.