340 F.2d 868
 Carmela N. IACURCI, individually and as Administratrix of the Estate of Lawrence Iacurci, deceased, and John Iacurci and Lawrence Iacurci, Jr., infants by their Guardian, Carmela N. Iacurci, Plaintiff-Appellees,
v.
The LUMMUS COMPANY, Defendant-Appellant.
 No. 447.
 Docket 28765.
 United States Court of Appeals Second Circuit.
 Argued April 29, 1964.
 Decided January 6, 1965.
 
 Arnold B. Elkind, Zelenko & Elkind, New York City, on the brief, for plaintiff-appellees.
 Raymond L. Falls, Jr., New York City (Floyd Abrams, Cahill, Gordon, Reindel & Ohl, New York City, on the brief), for defendant-appellant.
 Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.
 LUMBARD, Chief Judge.
 
 
 1
 The Lummus Company appeals from a judgment entered upon a $146,926 verdict for the plaintiff in a diversity action in the United States District Court for the Southern District of New York. The appeal turns on whether there was sufficient evidence to support the jury's finding that Lummus was negligent and that its negligence was the proximate cause of Lawrence Iacurci's death. As we find that the evidence, under governing Pennsylvania law, was not sufficient to support the jury's verdict, we reverse the judgment for the plaintiff and direct that judgment be entered in favor of the defendant Lummus Company.
 
 
 2
 Lummus was retained by the Beryllium Corporation, a producer of beryllium and beryllium products, to design and construct a new plant at Ashmore, Pennsylvania. Lummus did not itself manufacture the equipment for the plant but was responsible for its design and selection. One item of equipment, and the immediate cause of Iacurci's death, was a skip hoist — a bucket on an inclined track — used to transport a mixture of beryllium and other chemicals between two operations in the plant.
 
 
 3
 At the lower end of the track is a pit, 8 feet long, 6 feet wide and 4 feet deep, where the bucket is loaded; at the other end, some 10 feet above and 5 feet to the side of the pit, the bucket is emptied into a briquette-making machine. Beryllium is a highly toxic material. In order to prevent contamination of the plant, the skip hoist machinery is enclosed, and the pit itself is roofed with steel plates, leaving an opening just large enough for the bucket to pass through. The pit may be entered only by removing some of the plates, and a person working there must wear a dust respirator, glasses and gloves.
 
 
 4
 No one is in the pit during normal operations; the skip hoist and other machinery are remotely controlled from an instrument panel, known as a Thayer control panel. The jury could find, however, that Lummus should have anticipated that someone would go into the pit twice a week to lubricate the machinery and also that it would be necessary to go into the pit in order to obtain samples of the mixture. Such samples would be required only in calibrating the machinery which measured out the chemicals and presumably would be taken only infrequently.
 
 
 5
 Lubrication of the skip hoist seems not to involve any particular danger. To take a sample from the bucket, however, a workman must bend over it so that his body is between it and the roof of the pit. Iacurci was working in this position when the bucket was accidentally put in motion, crushing him against the steel plates.
 
 
 6
 The skip hoist is controlled by three switches, one on the Thayer control panel and two elsewhere. All three must be turned on in order to activate the machinery, and each switch can be padlocked in the off position. However, Lummus seems to have taken no steps to call the locking device to Beryllium's attention beyond sending it the manufacturer's general instructions, and warning tags rather than locks were supplied when the controls were installed.
 
 
 7
 The warning tags bore the words "Do Not Operate" in large letters. Prior to the accident Beryllium had put into effect safety regulations requiring that employees attach a tag to the switch controlling equipment on which they were working, and it instructed its employees generally in the use of the tags. In addition, appropriate posters were displayed in the plant. There was no direct evidence that Iacurci was instructed as to the use of the tags, and there even was dispute as to whether the safety regulations by their terms applied to a laborer such as he. However, the undisputed testimony of Robert Mensinger as to Iacurci's statements just prior to the accident, quoted below, appears conclusively to establish at least that Iacurci was aware of the tagging-out system.
 
 
 8
 The accident occurred on September 28, 1957. Lummus then had only clerical employees at the plant. The skip hoist had been turned over to Beryllium approximately one month earlier, and Beryllium had accepted the entire plant by September 20. During the shakedown period, Beryllium had experienced some difficulty in attaining the proper proportion of chemicals in the mixture. Iacurci, who was a laborer unassigned to any permanent department, was directed by Simon Morana, a supervisor, to remove the contents of the skip hoist for analysis. Iacurci proceeded to remove the plates covering the pit and descend into it.
 
 
 9
 Mensinger was employed by Beryllium as a lab technician at the time of the accident. He testified that just prior to the accident he had seen Iacurci leaning over the skip hoist bucket and had inquired whether the machinery had been tagged out. Iacurci replied, "Oh, hell, yeah, it must be." Mensinger was not satisfied, however, and he told Iacurci, "Wait a minute, I want to go over and double-check the switch." He started off for the main control panel but he was delayed on the way by a request to attend to some other business.
 
 
 10
 At the same time two other employees, Anthony Kasarda and William Hill, were working under the supervision of John Heffner on the briquetting device. It was necessary for them periodically to activate the skip hoist, and Heffner, unaware that Iacurci was working in the pit, gave Kasarda and Hill permission to turn it on. When the skip hoist jammed, they discovered that Iacurci had been pinned between the bucket and the metal top of the pit. He was rushed to a hospital but was dead on arrival.
 
 
 11
 On the record before us, there can be no doubt that Beryllium was negligent, and the jury so found in answering one of the court's interrogatories. However, this suit was not brought against Beryllium,[1] and the only question to be decided is whether Lummus should be held liable for Iacurci's death.
 
 
 12
 As we view plaintiff's contentions in the light of the evidence, they offer two general theories as to Lummus' negligence. The first is that Lummus was negligent in designing the skip hoist and controls. This theory was given to the jury in some detail on special interrogatories. They found Lummus negligent in designing the equipment, but of the five subquestions relating to the specific manner in which the design was faulty, they answered only one. They found that the design should have permitted removal of the bucket's contents without requiring a workman to put his head over the bucket.[2] In view of the court's instructions, the jury's failure to answer the other subquestions must be interpreted to mean that they found that defendant's negligence had not been established in those other respects.
 
 
 13
 A second theory for recovery is that Lummus was negligent in failing to instruct Beryllium in the use of the locking device. None of the interrogatories dealt directly with this but, since plaintiff's counsel made timely objection to that omission, we must consider whether the verdict in favor of the plaintiff could have been supported by findings under this theory.
 
 
 14
 We hold that, as a matter of law, Lummus was not required to design the pit so that a workman could stand upright beside the bucket. We also hold that, even if it was negligent for Lummus not to call the locking device to Beryllium's attention, this omission was not a cause of the accident and therefore is no basis for imposing liability. This suffices to dispose of the case, and we need not consider the jury's findings on the issues of intervening cause and contributory negligence, all of which were favorable to the plaintiff. Accordingly, we reverse the judgment of the district court and direct that judgment be entered for the defendant.
 
 I.
 
 15
 The Pennsylvania law as to manufacturers' liability has expressly followed the Restatement of Torts.[3] Where the alleged negligence lies in the design of the product, § 398 governs:
 
 
 16
 "A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."
 
 
 17
 The question before us, however, is not the broad one whether the jury could have found that Lummus did not exercise reasonable care in designing the skip hoist but the relatively narrow question whether they could have found the design unreasonable in not allowing a workman to stand upright beside the bucket. In other interrogatories the jury was asked whether the design was unreasonable in failing to include various safety features suggested by plaintiff's evidence. They did not answer these other interrogatories, and, in the light of the court's instructions, we must take it that they found that Lummus' negligence was not established in those respects. And the plaintiff's evidence and argument do not suggest any respect in which the design might have been improper other than those covered by the interrogatories.
 
 
 18
 The only evidence favorable to the plaintiff with respect to design of the pit itself consisted of brief statements by two experts. The defendant's witness, Herbert I. Hollander, conceded that the pit would have been safer had a workman been able to stand upright beside the bucket. Alfred F. Buff, testifying for the plaintiff, apparently assented to the description of the pit by plaintiff's counsel as "a dangerous condition"; however, Mr. Buff's recommendations for making the skip hoist safer included no suggestion as to construction of the pit.
 
 
 19
 That the design of the pit created a danger for a person emptying the bucket cannot be doubted; Iacurci's death is conclusive evidence of this. However, it does not necessarily follow that Lummus was negligent, and we do not think that there was an adequate basis for the jury's finding that it did not exercise reasonable care in designing the pit.
 
 
 20
 First, the danger was obvious. It required no knowledge of electrical or mechanical engineering to perceive the danger in wedging one's body between fixed steel plates and a movable 450 pound bucket or to realize that safety lay in insuring that the bucket would not be put in motion. We do not conclude that, under Pennsylvania law, a manufacturer need provide safety devices only where the danger is latent; Pennsylvania appears not to have drawn any sharp line between obvious and latent dangers. But the obviousness of the danger is one factor in determining negligence; a foolproof safety device is less likely to be required if the danger is obvious and the manufacturer can expect some cooperation from the user in mitigating the danger. The risk in this case was apparent, and it was proper for Lummus to design the machinery in the light of that fact.
 
 
 21
 Second, the pit was not normally a place of work. At most, employees were to go into it twice a week to lubricate the machinery and less frequently to sample the mixture, and only the latter appears to involve a risk that would be substantially lessened by allowing a workman to stand upright. Just as a grade crossing may suffice for a country road but be inadequate for an interstate highway, the safety devices guarding an area used only for occasional maintenance may reasonably require the worker's cooperation even though automatic devices, or the elimination of the danger altogether, are considered necessary on the production line.
 
 
 22
 Third, the locking device, if used, would have protected the workman as effectively as deepening the pit. (Indeed, the plaintiff's own expert, Mr. Buff, recommended only more effective safety switches.) Where the danger was obvious and arose only under exceptional circumstances, we believe that Lummus could design the pit on the assumption that the locking device would be used. Given that assumption, it was not negligent in designing the pit as it did.
 
 II.
 
 23
 The second theory suggested by the plaintiff's evidence and argument before the district court is that Lummus did not take reasonable steps to inform Beryllium of the importance of using locks with the switches. Plaintiff may not recover on this theory because Lummus' omissions in this respect, whether or not they were negligent, were not the cause of Iacurci's death. Had the question been put to the jury, they could have found that Lummus made no effort to inform Beryllium of the locking device beyond supplying it with the manufacturer's general instructions and that the equipment was installed with warning tags rather than locks attached. Although Lummus did not itself handle the installation, it presumably knew of it and was responsible for it. Since defendant's own argument was in part directed at establishing that locks were a satisfactory substitute for other safety devices, there may have been an adequate basis for finding Lummus negligent in this respect, and for purposes of this discussion, we assume that there was.
 
 
 24
 But, leaving aside the rules governing the liability of concurrent wrongdoers, it is elementary tort law that even a negligent defendant will not be liable if the accident would have occurred absent his negligence. If Lummus failed adequately to inform Beryllium of the importance of using locks, the effect of this failure did not extend beyond causing Beryllium to use tags instead. Plaintiff thus is entitled to recover under this second theory only if the jury could properly have found that the use of locks rather than tags would have prevented the accident.
 
 
 25
 The plaintiff's dilemma is this: She must show that the jury could have found that the machine was tagged by or for Iacurci, for even a lock is effective only if used. But she must reconcile this putative use of the tag with the fact that someone did turn the switch.
 
 
 26
 The difficulty of plaintiff's position can be seen by comparing this issue with the issue of contributory negligence. In finding Iacurci not contributorily negligent, the jury might have believed that he had not been properly instructed in the tagging-out system; that he had asked another employee to tag the machine and the latter failed to do so; that the machine had already been tagged and Iacurci reasonably but mistakenly did not think it necessary to add his own tag; or even if he had negligently failed to tag the machine, that this negligence was superseded by reasonable reliance on Mensinger's correcting the situation. But in each case the decedent's due care would have been no less futile if locks rather than tags had been in use.
 
 
 27
 Only two hypotheses avoid plaintiff's dilemma: The switch was turned despite the presence of a tag, or the tag had fallen off or been removed. There was no evidence directly supporting either hypothesis, and that someone would overlook or maliciously disregard a conspicuous warning tag is too unlikely to be inferred from the fact of accident alone; this is equally true of removing another employee's tag.
 
 
 28
 The remaining possibility, that the tag had simply fallen off, requires more detailed consideration of the switch mechanism. The tags were to be hung from the same notch in the switch handle that would have been used for a lock. The notch itself formed three sides of a square, and plaintiff's counsel presumably thought that the fourth side was open when he argued that the tag might have fallen off. A replica of the switch, however — introduced only at the close of the trial — reveals that the fourth side of the square is in fact closed off by a slide mechanism, and in no position does this slide leave a gap through which the string of a tag might slip. Thus, the tag could fall off only if the string somehow came untied. This seems at least as unlikely as the possibility that someone deliberately removed the tag or turned a tagged switch, and the sum of these possibilities, unsupported by anything more than speculation from the fact of the accident, does not provide an adequate basis for finding that the use of tags rather than locks was a cause of Iacurci's death.
 
 
 29
 The judgment of the district court is reversed; the district court is directed to enter judgment for the defendant.
 
 
 
 Notes:
 
 
 [1]
 No common law action could have been brought against Iacurci's employer, Beryllium, if Iacurci was covered by the Pennsylvania workmen's compensation statute. Jackson v. Gleason, 320 Pa. 545, 182 A. 498 (1936)
 
 
 [2]
 "1. Are you persuaded by a fair preponderance of the credible evidence that the defendant, The Lummus Company, negligently designed the skip hoist pit and the location for the switches serving the skip hoist at the Beryllium Corporation's plant at Hazleton, Pennsylvania?
 X
 ___ ___
 YES NO
 "If your answer to Question 1 is in the affirmative, please indicate which, if any, of the following findings you have made in reaching this conclusion:
 "(a) There should have been a control button in the pit.
 ___ ___
 YES NO
 "(b) There should have been an automatic interlock on the cover of the pit which would have cut off the power to the skip hoist.
 ___ ___
 YES NO
 "(c) There should have been an unobstructed view between the controls for the skip hoist and the skip hoist bucket.
 ___ ___
 YES NO
 "(d) The electrical controls for the skip hoist equipment should have included locks so as to permit the locking of switches in a closed position.
 ___ ___
 YES NO
 "(e) The contents of the skip hoist bucket should have been removable without the necessity for a person to put his head over the bucket and into the skip hoist shaft.
 X
 ___ ___
 YES NO"
 
 
 [3]
 See Mannsz v. Macwhyte Co., 155 F.2d 445, 450 (3 Cir. 1946) and the cases cited therein. Although the court was concerned only with § 395, § 398 is merely a special application of the former section. Restatement, Torts § 398, comment a
 
 
 
 30
 MOORE, Circuit Judge (concurring).
 
 
 31
 From their answers to interrogatories 4 and 5, the jury found Beryllium was negligent in its operation of the skip hoist and that this negligence was a proximate cause of Iacurci's death.[1] But this negligence would result in no liability against Lummus. The court, however, addressed to the jury an interrogatory which, if answered affirmatively, would permit the jury to impose liability on Lummus even if it found that Beryllium were negligent, namely, "did Lummus have strong reason to believe that Beryllium or its employees would act negligently and thereby create an unreasonable risk of harm?"[2] The "strong reason to believe" theory is relevant because, as stated in Comment m, section 290, Restatement of Torts, where a chattel is turned over to another (here Lummus to Beryllium): "In such case, the person who assumes control is usually alone responsible, not only for the use to which he puts his land or chattels, but also for his failure to remove any dangerous conditions existing when he takes control, unless the actor has strong reason to expect the third person to misuse the land or chattels or to fail to remedy the dangerous condition." In other words, Beryllium's negligence would relieve Lummus of liability unless Lummus had strong reason to believe that Beryllium would act negligently. Furthermore, the jury were told that this "strong reason to believe" exception presented "one of the crucial issues in the case." Throughout the charge the court stressed the fact that control of the plant by Beryllium would not make it "solely responsible" if "Lummus had strong reason to expect that Beryllium * * * would be negligent in its operation and management of the plant"; that plaintiffs had to prove by a fair preponderance of the credible evidence that the defendant had strong reason to expect Beryllium to be negligent in its operation and management of the plant; and that if Beryllium were negligent in its supervision of its employees working in connection with the skip hoist or in failing to adopt a locking instead of a tagging system, then the jury should render a defendant's verdict unless Lummus had strong reason to believe that Beryllium would be negligent in these respects.
 
 
 32
 The jury found that Beryllium was negligent and that this negligence was a proximate cause of Iacurci's death. They also found that Lummus had strong reason to believe that Beryllium would act negligently, thus bringing the case within the exception so stressed by the court. However, a careful examination of the record reveals no proof whatsoever that Lummus had any reason — much less a strong reason — to believe that the employees of Beryllium would act negligently in their operation of the hoist. If in its normal operation an employee was required to stand beside the bucket and remove its contents manually by putting his head into the bucket, then and only then would the question of placing some device protective against injury arise. When the hoist was in operation, no employee was required to be or should have been in the pit where he might have had an opportunity to commit some negligent act. To take a sample from the interior of the bucket when the hoist was not in motion required the material to be obtained by some device which would enter the bucket. Someone or something had to reach inside the bucket. There was no proof, however, that regular sampling was a known requirement of operation. Yet to send to the jury the question of attributing negligence in the design of a machine which would not enable the contents of the bucket to be removed without "a person [putting] his head over the bucket and into the skip hoist shaft" is to assume that this act of Beryllium's employee was a part of the machine's normal operation.
 
 
 33
 The "strong reason to believe" theory must be related to some specific operation. It would be difficult to imagine any machine with revolving parts which could not be the cause of injury if some part of the body were brought into contact with a whirling knife or enmeshed in rotating gears. A machine possessing every safeguard in normal operation could scarcely be designed so as to avoid the necessity of a repairman touching it or putting his hands into it while making repairs.
 
 
 34
 Although the jury did not attribute any negligence of design to inadequate locking devices or control buttons, there is proof (and none to the contrary) that the hoist as designed had switch locks. That Beryllium chose to use tags instead of actual locks cannot be attributed to, or justify a conclusion of, a faulty design.
 
 
 35
 § 398 of the Restatement of Torts provides:
 
 
 36
 "A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."
 
 
 37
 The critical issue under this section is whether the hoist was so designed as to be "dangerous for the uses for which it is manufactured." The manufacturer was entitled to expect that the user would use the hoist "lawfully." On its part, the manufacturer was charged with a duty "to exercise reasonable care in the adoption of a safe plan or design" so as to avoid bodily harm to those using it or "in the vicinity of its probable use." The use for which the hoist was intended was to convey the beryllium mix within a sealed machine from one place to another. It was not dangerous for this purpose. While in operation, no one was intended to be "in the vicinity." The hoist thus met the requirements of proper design for its intended purpose.
 
 
 38
 Despite the expectation of lawful use expressed in section 398, plaintiffs argue that Lummus should have considered the situation which resulted in the accident as "expectable action" (Sec. 302(b)) and should have known the habits of human beings. However, this assumption of knowledge is qualified by the words "in so far as they are matters of common knowledge at the time and in the community" (Sec. 290).
 
 
 39
 Recently the Third Circuit in Smith v. Hobart Manufacturing Company, 302 F.2d 570 (1962) in a machine design case had occasion to review the Pennsylvania law on the subject of manufacturer's liability. A meat grinding machine was equipped with a safety guard. The purchaser had removed the guard, an act held to have been negligent. Smith, an employee of the purchaser, was injured by the machine. The Court of Appeals posed the question submitted by the trial court to the jury under the doctrine of foreseeability: "Did Hobart [the manufacturer] expect or should it have expected that Holiday [the purchaser] would remove the guard and operate the machine without it?" It answered the question by saying: "We think that a Pennsylvania Court would hold that, on the evidence presented in this case, a trial court should not have left that question for the jury to decide" (p. 574). Referring to Tua v. Brentwood Motor Coach Co., 371 Pa. 570, 92 A.2d 209 (1952) and after quoting Comment m to § 290 of the Restatement of Torts, it continued: "In our opinion, a Pennsylvania Court would conclude that there was not enough evidence from which the jury could infer that Hobart had reason, let alone strong reason, to expect that Holiday would remove the guard and operate the machine without it" (p. 574). The court concluded: "Hence, under the facts shown, Hobart owed no duty to Smith for the injuries resulting from the unanticipated misuse of the grinder" (p. 575).
 
 
 40
 In the Tua case, supra, the Pennsylvania Supreme Court had said: "Want of ordinary care consists in failure to anticipate what is reasonably probable, not what is remotely possible."
 
 
 41
 Shortly after Smith v. Hobart Manufacturing Company, supra, in Goldsmith v. Martin Marietta Corporation, D.C., 211 F.Supp. 91 (1962), the claim was made that an airplane crash was caused by the alleged negligent design by the Bendix Corporation of a "caging switch" without an adequate guard to prevent its accidental actuation. In that case there was intervening negligence by others as there was in this case by Beryllium. The court asked the question: "Is the mere designer of an item, who can foresee the obvious danger of negligent use and who warns against same, liable for failing to provide in his design a safety device to protect against such negligence?" and answered it in the negative. Dealing with the Pennsylvania law, the court said: "Under the law of Pennsylvania, where a second tort-feasor has become aware of the danger created by an original tort-feasor and nonetheless thereafter brings about an accident by his own independent act, the original tort-feasor is relieved of all liability" (p. 95). The court recognized the "strong reason to expect" theory expressed in comment m, Sec. 290, but said that "In our opinion, a Pennsylvania court would conclude, as a matter of law, that Bendix did not have strong reason to expect and anticipate the peculiar configuration of all of the circumstances alleged by the plaintiffs to have conspired to have produced the losses complained of: * * *" (p. 97).
 
 
 42
 An a fortiori situation is presented here. There is no claim that the hoist was defective in any way. There were switches which were adequate to prevent activation unless they were negligently thrown by Beryllium's employees. Furthermore, the danger was obvious. Iacurci's own words established this fact. The risk was apparent.
 
 
 43
 Lummus had no notice of any likelihood or of even the possibility that Beryllium might so disregard the safety devices that an employee in the pit might be subjected to the danger of the hoist being set in motion. No proof of prior unsafe practice was offered. See Muller v. A. B. Kirschbaum Co., 298 Pa. 560, 148 A. 851 (1930). In the absence of any such notice or any other proof from which it could be said that the manufacturer should reasonably have foreseen that Beryllium would send an employee into the pit to lean over the bucket without using the available safeguards, it should not be subjected to liability. See Mannsz v. Macwhyte Co., 155 F.2d 445, 3 Cir., 1946, affirming judgments entered on directed verdicts in favor of defendant manufacturer in actions removed from the state court in Pennsylvania upon the ground that Section 395 was adhered to by the Supreme Court of Pennsylvania and that the allegedly defective wire rope had not been used for the purpose for which it was intended. Nor was there any evidence that during the shake-down period prior to Iacurci's death, Lummus had observed or been made aware of any conduct on Beryllium's part from which the conclusion could have been drawn that Lummus had any reason (much less strong reason) to believe that Beryllium would be negligent in its supervision of its employees or careless in its enforcement of safety precautions or regulations.
 
 
 44
 The event which resulted in Iacurci's death was no part of the operation for which the hoist was designed. If the hoist was negligently designed, its danger to persons operating it or in its vicinity must be tested by its normal and expected functioning. Had Beryllium chosen to order an employee to expose himself to danger, while the machine was so operating, by performing some task not connected with its regular or intended operations, liability could not have been attributed to negligence of design. The decision to order Iacurci to obtain a sample at the time and place he did was exclusively that of Beryllium — a decision which Lummus had no opportunity to guard or design against. It was not even remotely foreseeable.
 
 
 45
 Although any injury, particularly resulting in death, is to be deplored, liability therefor should be imposed only upon the persons or corporations responsible for the injury. Clearly Beryllium was negligent. The jury has so held; the proof justifies such a conclusion. But where the record is devoid of any proof which could support a finding that the design of the machine was the cause of the injury, fundamental principles of law (and justice) do not permit a verdict against one not responsible for it.
 
 
 
 Notes:
 
 
 [1]
 "4. Are you persuaded by a fair preponderance of the credible evidence that the Beryllium Corporation or any of its employees was negligent with respect to the operation of the skip hoist on September 28, 1957?
 X
 ____ ____
 Yes No
 "5. If the answer to Question 4 is `Yes,' are you persuaded by a fair preponderance of the credible evidence that the negligence of the Beryllium Corporation or its employees was a proximate cause of the death of Lawrence Iacurci?
 X
 ____ ____
 Yes No"
 
 
 [2]
 "7. If the answers to questions 4 and 5 are both `yes,' did Lummus have strong reason to believe that Beryllium or its employees would act negligently and thereby create an unreasonable risk of harm?
 X
 ____ ____
 Yes No"
 
 
 
 46
 SMITH, Circuit Judge (dissenting).
 
 
 47
 I respectfully dissent. We should not usurp the function of the jury. Plaintiff introduced considerable evidence from which a jury might conclude that the skip hoist had been negligently designed. There was testimony indicating that the pit was too shallow, that it contained no light, that the switches were located far from the pit and there was no control in the pit itself, and that locking safety devices should have been installed. Both experts agreed that the pit could have been made safer, and Buff's testimony was reasonably interpreted by the jury as proof that the necessity of putting the upper part of one's body over the bucket created a dangerous condition. Surely Lummus could reasonably be expected to know that samples of the mix might not infrequently be required, and guard against such a disaster as occurred to Iacurci. If gain must be weighed against cost, the scales are in the hands of the jury, which had evidence before it that for $150, $30 for material and $120 for labor, an emergency switch could have been installed in the pit. On the interrogatories answered by the jury the verdict should be sustained.
 
 
 48
 Moreover, the verdict could be supported even if the jury had not checked any of the more specific findings. The interrogatory directed the jury to check which, if any, of the listed specific findings it had made in reaching the conclusion that the defendant had negligently designed the pit. It is quite conceivable on this record that the jury found that the equipment had been negligently designed in some fashion other than those five listed on the interrogatories.
 
 
 49
 Nor were the jury's findings on intervening cause or contributory negligence without support in the record.[1] Thus in Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A.2d 517 (1949), where the Pennsylvania Supreme Court reinstated a jury verdict against the builder and installer of a natural gas storage tank, the court dismissed the contention that the gas company's negligence in failing to inspect constituted an intervening act of negligence, quoting from Harper on Torts: "A negligent defendant can not escape liability because of a failure on the part of some third person to perform an affirmative duty which, if properly performed, would have enabled the plaintiff to avoid the risk created by the defendant's negligence. The failure of the other to inspect adequately may make him liable to the party harmed, but it will not relieve the defendant whose negligence was responsible for the hazard in the first place." 68 A.2d at 529. Here the jury found Beryllium negligent in failing to warn other employees in the vicinity that Iacurci was in the hoist pit, thereby triggering the defendant's original negligence in designing the pit. If Beryllium's delict was reasonably foreseeable, the defendant is not relieved from liability for creating the dangerous situation. See Shimer v. Bangor Gas Co., 410 Pa. 92, 188 A.2d 734 (1963); 2 Harper & James on Torts § 28.10 (1956).
 
 
 50
 The Supreme Court has been quite reluctant to permit jury verdicts to be upset. "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). Whether one applies a state or federal standard to test the sufficiency of evidence for the jury,[2] the jury could reasonably conclude that Lummus was negligent and that Iacurci had exercised reasonable care for his safety under the circumstances.
 
 
 51
 I would affirm the orders and judgment of the District Court.
 
 
 
 Notes:
 
 
 [1]
 Since the majority does not base reversal on any holding that Iacurci was negligent as a matter of law, I do not discuss the evidence on that point
 
 
 [2]
 See Mercer v. Theriot, 377 U.S. 152, 84 S.Ct. 1157, 12 L.Ed.2d 206 (May 4, 1964), Evans v. S. J. Grooves & Sons, 315 F. 2d 335, 342 (2 Cir. 1963). Cf. Shirey v. Louisville & Nashville Railroad Co., 327 F.2d 549 (5 Cir. 1964)