AMERICAN SMELTING, AND REFIN-ING CO., Plaintiff-Appellee,

v.

S.S. IRISH SPRUCE, her engines, tackle, etc., and Irish Shipping Ltd., Defendants-Appellants.

Complaint of IRISH SHIPPING LTD., Plaintiff-Appellant, as owner of the S.S. "IRISH SPRUCE", for exoneration from or limitation of liability.

COMPANIA PERUANA de VAPORES, S.A., Claimant-Appellant,

v.

SPRAGUE & RHODES COMMODITY CORP., et al., Claimants-Appellees.

Nos. 487, 488, Dockets 75–7441, 75–7445.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1976.

Decided Jan. 17, 1977.

Nicholas J. Healy, New York City (Allan A. Baillie, John C. Koster, Healy & Baillie, New York City, on the brief), for appellant Irish Shipping Ltd.

Richard G. Ashworth, Haight, Gardner, Poor & Havens, New York City, on the brief, for appellant Compania Peruana de Vapores, S.A.

Douglas A. Jacobsen, New York City (Francis M. O'Regan, Bigham, Englar, Jones & Houston, New York City, on the brief), for appellees.

Before LUMBARD and TIMBERS, Circuit Judges, and BRYAN, District Judge.**

Opinion reassigned on November 1, 1976 to Judge Lumbard at the request of Judge Timbers.

LUMBARD, Circuit Judge:

This appeal concerns the district court's confirmation of a special master's report

** United States District Judge for the Southern District of New York, sitting by designation.

which found the S.S. Irish Spruce to have been unseaworthy at the time of its foundering in the Caribbean and which further found that this unseaworthiness was a proximate cause of the stranding. We find the holding relating to proximate causation to be erroneous and, accordingly, reverse.

## I.

The events leading up to the stranding were recounted in depositions from all the officers of the Irish Spruce and in testimony before the magistrate by First Officer Kelly and Second Officer Healy. Loaded with appellees' cargo, the Irish Spruce cleared the Panama Canal and entered the Caribbean on January 25, 1972. Her projected course to New Orleans was northerly toward the Yucatan Pass (which lies between Cuba and the Yucatan Peninsula), passing between Roncador Bank and Serrana Bank to the east and Quito Sueno Bank to the west. Quito Sueno, whose name translates as "troubled sleep," is an uninhabited or virtually uninhabited possession of Colombia which lies about 120 miles off the eastern coast of Nicaragua and at a greater distance north of Colombia's mainland. As the magistrate reported, "hazards to navigation are poorly marked and inadequately serviced" in this area of the Caribbean.

Early in the morning of January 26, shortly after the ship left the Canal, rough seas and heavy swells forced a change of course more to the eastward than had been planned originally. As the weather eased at midday other minor adjustments were made in order to regain the base course. Partly cloudy skies and rain made it impossible to obtain reliable star sights. Reliance, therefore, was placed on "dead reckoning" and "sun line" positions, navigational techniques which are inherently inferior to star sights or radio fixes and which are only used in the absence of surer guideposts. At about 0930 or 1000 hours on the 26th, Third Officer O'Connor took sun sights and then moved up the ship's morning position line until noon, when he took more sun sights. Second Officer Healy checked O'Connor's work and concluded that it was correct. At dusk (about 1900 hours), Chief Officer Kelly attempted to obtain an accurate locational fix by using star sights but he was prevented from doing so when rain obscured the horizon.

During the oncoming night the ship was to pass between the poorly marked Roncador and Quito Sueno Banks. In order to do so the navigators intended to alter the ship's course from 330 degrees to 323 degrees upon the first sighting of Roncador Bank. The light on Roncador is visible 13 miles under optimum conditions and it was planned that the boat would pass 11 miles off Roncador at 2300 hours on the 26th. The Roncador light was never sighted that evening and the vessel was kept on the 330 degree course until midnight when the shift to a 323 degree course was finally made. Although the vessel was equipped with a working radar apparatus, no radar reflection was had off of Roncador; this may not have been surprising, however, since Roncador was a low lying reef and the only high object, the light tower, was an open latticework structure without a special radar reflector. Even though no precision sightings had been had since the noontime sun sight and even though the sun sights employed are inherently less accurate than star sights or radiobeacon fixes, the Irish Spruce steamed ahead at full speed into the night.

Second Officer Healy, a relatively young officer whom Magistrate Goettel described as "an officer of 'meticulosity in matters of navigation,'" stood watch on the bridge with a seaman lookout from midnight on, early on the 27th. Captain Kerr was also on the bridge during most of this watch. The radar and fathometer (depth meter) were in operation. However, since the vessel was travelling far off the mainland and since the various reefs were low lying, the radar was none too valuable a navigational tool in these waters. Furthermore, since the reefs in this part of the Caribbean come up very fast from the bottom, which is to say that they are steep sided, the fathometer was also a most inadequate tool to prevent stranding since it was unlikely to pro-

vide enough advance warning to allow the officer in charge to do anything in time.

The Irish Spruce was also equipped with a British-made, Decca-brand Navigator. This is an electronic position finder which depends on signals from special sending stations. It was far beyond the reach of such signals in this part of the Caribbean. The ship did not have a similar, though incompatible, American-made Loran navigational system which would have been of some use in this part of the world during nighttime hours. Finally, the Irish Spruce was equipped with a radio-direction finder (RDF) which was useful in locating more or less precisely the orientation of any radio signals which might be receivable. In this part of the Caribbean, however, radio signals useful to the RDF were few and far between. On the basis of previous trips through these same waters, navigator Healy knew that a radiobeacon was located on Swan Island, a former British possession some 200 or so miles north of Quito Sueno Bank. When his watch began early on the morning of the 27th, Healy had the RDF turned on in an effort to pick up the Swan Island beacon. After warming up the unit he was only able to hear static on the channel assigned to Swan Island. He turned off the set without rotating the dial to try to find other signals. Having been through these shipping lanes before, Healy apparently thought that he already knew the few radiobeacons which might be available and so he did not refer on this particular occasion to the 1969 edition of the British Admiralty List of Radio Signals which was on board the Irish Spruce, a work which he had consulted on previous occasions.[1]

If Healy had rotated the dial of the RDF, he might have picked up the signal sent out by an aero radiobeacon located on San Andres Island, about 100 miles to the west. This beacon was not included in the several listings of radiobeacons in the 1969 List aboard the ship; its existence was, however, shown on a clear map of this region which appeared in the back of the 1969 List. Its omission from the listings appears to have been because the signal was categorized as an aero radiobeacon as opposed to a marine radiobeacon. Aero radiobeacons are often perfectly suited for ships to use as well as airplanes but not in all situations (e. g. where there is a land obstruction or where the beacon's strength is largely or entirely diverted upwards at the sending station for the convenience of planes). The San Andres radiobeacon would likely have been useful for a ship RDF since there was no elevated land near the sending station and since the signal apparently went out along the ground level as well as upwards.

A new 1971 edition of the British Admiralty radio signal list, which had been mailed to New Orleans to await the ship's imminent arrival, included the San Andres beacon in its listings, not just on a map; furthermore, the general organization of this edition was significantly varied from that of the 1969 edition. The magistrate concluded that Healy, being a meticulous young officer, would have pored over this edition if he had had it on board and, having done so, would have found the San Andres listing even though it appeared under "Colombia," a country much further away to the south than "Nicaragua" which lay 120 miles to the west. The 1971 edition would also have given the beacon's strength, 1 kilowatt, a power rating sufficiently high by radiobeacon standards so that, in Magistrate Goettel's estimation, the ship's officers would have been particularly motivated to try to pick it up. Healy testified that had he known of the San Andres beacon, he might have tried to raise it on the RDF; however, he also testified that on hearing interference static on the Swan Island channel, he expected to hear static on all other channels and therefore might not have bothered to check the San Andres channel in any event. The magistrate found further that if the San Andres bea-

---

1. At trial, Healy was not specifically asked why he had not consulted the List on this particular occasion.

con had been used, the stranding probably would have been avoided.

The San Andres signal was never used, however, and the ship's officers kept to the course onto which they had headed at midnight and maintained full speed. Radar picked up several reflections taken to be rain squalls and one stationary object with no lights. The captain took this radar blip to be a seagoing fishing boat lying dead in the water without lights.

At 0329 hours on the 27th the captain noted the fathometer indicated a sharply rising bottom and showed that the Irish Spruce had just passed over a reef only seven feet beneath the keel. At the same time Healy and the look-out saw the unpleasant spectacle of surf breaking just ahead. Although the engines were quickly reversed the ship ran hard aground on Quito Sueno Bank.

Following the stranding, appellee American Smelting and Refining Co. instituted an action against the ship and against the time charterer, Compania Peruana de Vapores, for the loss of cargo. The shipowner filed a separate complaint for exoneration from, or limitation of, any liability arising out of the stranding, and the first suit was thereupon stayed. Cargo claimants Sprague & Rhodes Commodity Corp. and American Smelting filed claims for $2.2 million in the limitation proceeding. The two suits were consolidated for trial on the sole issue of liability.

In January 1974 Judge Frankel requested the parties' consent to refer the case to a magistrate to "hear and report." Upon securing consent of the parties, Judge Frankel referred the case to Magistrate Goettel by an order entered January 28, 1974. After a three-day hearing in April 1974, Magistrate Goettel filed a report on October 15, 1974 holding both the shipowner and time charterer liable to the cargo claimants and holding that the charterer was entitled to indemnity from the shipowner. Magistrate Goettel found that the shipowners's delay in furnishing the 1971 British Admiralty List rendered the Irish Spruce unseaworthy and was a cause of the stranding.

After the cargo claimants had moved for confirmation of the magistrate's report and after objections had been filed thereto, Judge Frankel, on March 4, 1975, approved the magistrate's report insofar as it found unseaworthiness but withheld approval of his ruling that proximate causation had been shown between the unseaworthy condition (the absence of the 1971 British Admiralty radiobeacon list) and the occurrence of the stranding. He remanded the case to Magistrate Goettel for a supplemental report on causation. In his supplemental report of May 8, 1975, Magistrate Goettel adhered to his original position, basing it primarily on his belief that navigator Healy would have carefully combed the new 1971 volume had it been available on board, and in doing so, would have discovered the existence of the San Andres beacon and its 1 kilowatt power. Judge Frankel approved the supplemental report in a memorandum decision dated June 16, 1975, and an interlocutory judgment was entered July 2, 1975, from which this appeal has been taken pursuant to 28 U.S.C. § 1292(a)(3).

II.

There can be no quarrel with the finding in the magistrate's initial report that the "immediate cause of the stranding was imprudent navigation." It is clear that the Irish Spruce was set on a route which took it through treacherous waters. Quito Sueno Bank was low lying and thus a poor radar target. The only light marking the bank is located at the northern tip, which means that ships approaching from the south, such as the Irish Spruce, could run aground before the light was ever spotted. As noted previously, the reefs and shoals in this part of the Caribbean often rise so quickly from the depths that a fathometer is virtually useless as a tool for safe navigation. Finally, radiobeacons were infrequently spaced in this region. Notwithstanding these perils and notwithstanding that the ship had been sailed by what was essentially nothing more than dead reckoning for almost 24 hours, the ship was kept at full speed across the darkened waters.

Liability was not placed on the appellants because of poor seamanship, however. Such a risk is an excepted peril under the clear terms of Section 4(2)(a) of COGSA, 46 U.S.C. § 1304(2)(a). Liability was imposed because it was determined by the magistrate that the absence of the 1971 British Admiralty List of Radio Signals (Vol. 2) was an "unseaworthy condition" and that this omission was a proximate cause of the stranding. Quoting Herman Wouk's *Caine Mutiny,* the magistrate concluded that while "the absence of the new light list may seem a small defect, 'the event turned on [it] . . . as the massive door of a vault turns on a small jewel bearing.' "

■ As we conclude that no showing of proximate cause has been made as a matter of law, we must reverse the interlocutory judgment of the district court. Magistrate Goettel found that had Officer Healy, or any other officer, known of the San Andres radiobeacon and its 1.0 kw power and continuous operation, he would have attempted to navigate by it. This information could have been obtained from the lists in the 1971 Admiralty List of Radiobeacons if that edition had been aboard at the time. However, the existence, call sign, and radio frequency of the San Andres beacon were also readily ascertainable from the area diagram contained in the 1969 Admiralty List of Radiobeacons, which was on board. No satisfactory explanation is offered for why Officer Healy ignored the diagrams and relied instead solely on the alphabetical and geographical indices in the body of the 1969 volume.

It is clear that if Officer Healy had inspected the diagrams, he would have been no less likely to attempt to raise a signal from the San Andres beacon than he would have been if the 1971 List had been available. Of course, the diagram did not specify the power or times of operation of the radiobeacon, and there is also some dispute between the parties over the authoritativeness of these diagrams, but these facts seem irrelevant to this case. From textual discussion in the 1969 edition, it appears that aero radiobeacons on small islands can

be a useful tool for marine navigation. Most aero beacons broadcast twenty-four hours a day, and the relatively small size of the island land mass reduces the possibility of error being caused by "land effect" through the reflection or refraction of the radio waves. Lacking any better means of navigation and knowing that an aero radiobeacon might be broadcasting from San Andres, any reasonably conscientious navigator would have checked the beacon's frequency on the RDF simply on the chance that a signal could be raised. Thus, under the circumstances the 1969 edition should have been fully as adequate as the 1971 edition.

■ The magistrate assigned great significance to his conclusion that Officer Healy, who had never discovered the San Andres listing in the 1969 edition, would have discovered it in the reorganized 1971 edition. This fortuity, however, has nothing to do with proximate cause. Liability must rest on causal relationship between the negligent aspect of the conduct and the harm resulting from the conduct. See, *e. g., Mahone v. Birmingham Elec. Co.,* 261 Ala. 132, 73 So.2d 378, 381–82 (1954); *Browne v. Shyne,* 242 N.Y. 176, 151 N.E. 197 (1926); *Cirsosky v. Smathers,* 128 S.C. 358, 122 S.E. 864, 865–66 (1924); *Gorris v. Scott,* L.R. 9 Ex. 125 (1874). See generally R. Keeton, Legal Cause in the Law of Torts 13–18 (1963). The purpose of requiring shipowners to send new manuals and charts to their ships promptly is not the stimulation of studiousness among crews. Where the absence of up-to-date manuals and charts is an unseaworthy condition, the damage that is proximately caused by this unseaworthiness is such damage as is attributable to inadequacy of the out-of-date materials. Here the damage was not a consequence of any inadequacy in the 1969 edition; the damage resulted from the ship's officers' failure to make full use of the 1969 edition. It is no reflection on the 1969 edition that the accident might have been avoided because Officer Healy would have studied the 1971 edition and found in it what he had overlooked in the 1969 edition. Therefore,

any unseaworthiness which conceivably might be charged to the absence of the 1971 edition cannot be held to have been a proximate cause of the stranding.

The judgments against the S.S. Irish Spruce, Irish Shipping Ltd., and Compania Peruana de Vapores, S.A. are reversed.

