**McALLISTER BROTHERS, INC., the BARGE McALLISTER # 80, its owners, underwriters, etc., and the cargo laden aboard said vessel, its owners and underwriters, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 85 Civ. 0098 (CHT).**

United States District Court, S.D. New York.

March 20, 1989.

Richard K. Willard Asst. Atty. Gen., Rudolph W. Giuliani, U.S. Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, New York City, for defendant (Janis G. Schulmeisters, of counsel).

James M. Leonard, New York City, for plaintiffs (Michael Garabedian, of counsel).

TENNEY, District Judge.

Plaintiffs McAllister Brothers, Inc., the Barge McALLISTER 80, its owners, underwriters and cargo, bring this action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.* (1982), and the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 741 *et seq.* (1982), claiming damages of three and one-half million dollars resulting from a grounding on Diamond Reef in the Hudson River, New York. By stipulation of the parties a bifurcated trial was held. For the reasons hereinafter set forth, I find that plaintiff has failed to prove, by a preponderance of the credible evidence, that the United States, acting through the Coast Guard, failed to use reasonable care in marking Diamond Reef and further find that the grounding was caused solely by the negligence of the mate and the shipowner.

The following, including those additional facts referred to in the Discussion, constitutes the court's Findings of Fact and Conclusions of Law on the issue of liability pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

*The Parties and Vessels Involved*

1. Plaintiff, McAllister Brothers, Inc. (hereinafter "plaintiff", "plaintiff McAllister" or "shipowner"), is a corporation doing business with an office in New York City. At all material times, plaintiff McAllister owned and operated the Tug MARJORIE B McALLISTER (hereinafter "MARJORIE" or "the tug"), a diesel-propelled 4200-horsepower tug of 189 gross tons, 111.1 feet long, having a draft of twelve feet forward and fourteen feet aft (Stipulated Facts 1, 3 and 4; Casualty Report (Exh. JJ)).

2. The Barge McALLISTER 80 (hereinafter "Barge" or "Barge 80") at all times was a steel-tank barge with a single skin, 338 feet long, 70 feet wide, and a loaded draft of 20 feet forward and aft. (Exh. JJ; Trial Transcript ("Tr.") 17–21). The barge had a forward and after rake which enclosed void spaces (Tr. 20).

3. At all material times, the bow of the tug MARJORIE was secured snugly into the notch of the barge, making both vessels "an integrated tug and barge" unit 445 feet long (Exh. JJ; Tr. 19–21, 203, 207; Exh. XX ("Pontin dep.") 71–72; Exh. L). Barge 80 was loaded with approximately 8100 barrels of gasoline (Stipulated Fact 6). Loaded, it had a freeboard of two feet. In effect, this was the equivalent of a 400–450 foot tanker proceeding up the Hudson River.

4. The captain of Tug MARJORIE was Herbert T. Pontin (Pontin dep. 3–4; Tr. 17). Captain Pontin first received a first-class pilot's license in 1943 at age twenty-one for waters including the Hudson River (Pontin dep. 6–7). In 1976 Pontin joined plaintiff McAllister as a tug mate, and was upgraded to the MARJORIE's master in 1981 (Pontin dep. 3–11). When he testified at his deposition in September 1985, he was serving as the MARJORIE's mate, having resigned his position as master in March 1984 (Pontin dep. 3–4).

5. The mate of the tug in charge of the navigation of the flotilla at material times was Anthony J. McAllister, III (hereinafter "McAllister," "Mate McAllister," "mate," or "pilot"), and his deckhand was Neil Woodward (Tr. 22, 29–30, 36). Mate McAllister had received a license as third mate in 1981 and had joined the MARJORIE as mate in July 1982 (Tr. 16–17). He was a 1981 graduate of the State University of New York, Maritime College, at Fort Schuyler. At Fort Schuyler he was awarded a radar observer's endorsement and his curriculum included seamanship, weather, piloting, celestial navigation and shipboard

operations. (Tr. 12). His father was the president of plaintiff McAllister Brothers, Inc.

6. Before this voyage, Mate McAllister had participated in one trip up the Hudson River to Albany, but he was not on watch on that trip when the flotilla passed the Diamond Reef area. Thus, January 9, 1983, the date of the grounding in this case, was the first time McAllister navigated in the area of Diamond Reef (Tr. 25).

7. The MARJORIE was equipped with a magnetic and a gyro compass, a loran, two radars and a searchlight (Tr. 25; Pontin dep. 72–76; Exh. M (sketch by Pontin)). One radar was a Decca make with a seven-inch screen with eight scale options from one-half mile to twenty-four miles (Tr. 23). The other radar, a Decca with a twelve-inch screen, which was integrated with the other equipment, was inoperable on the date of the grounding so that the mate was compelled to use the secondary smaller radar (Tr. 108). In addition to charts, there were dividers, triangles and compasses available for plotting (Tr. 134).

8. The crew of the tug consisted of Captain Pontin, Mate McAllister, a cook, an engineer, and three deckhands (Pontin dep. 45; Exh. ZZ ("Del Greco dep.") 10). The captain and mate each stood a six-hour watch with one deckhand. The third deckhand was "designated barge captain" of the unmanned barge (Pontin dep. 44–46).

9. The duties of the deckhand on watch included, as a regular procedure, sanitary duties, making rounds, bringing coffee to the captain or mate on watch from the galley two decks below, and checking the lines securing the tug and the barge (Pontin dep. 46–47).

10. The usual practice of the watch-standing deckhand going below to get coffee and to perform other tasks was well known to the shoreside managerial personnel (Del Greco dep. 11). During such times the navigating mate or captain on duty was the only individual in the wheelhouse—steering, keeping a lookout, and navigating.

11. The wheelhouse of the tug MARJORIE was approximately ten feet wide and ran approximately six to seven feet fore and aft. It was mounted on a telescopic base which permitted it to be raised approximately thirty feet when the tug was pushing a light barge (Tr. 137–38).

*The Voyage*

12. The flotilla departed from Gulfport, in New York harbor, at about noon on Sunday, January 9, 1983 (Exh. 35; Tr. 28–30) with Captain Pontin at the helm on the 1200–1800 watch (Tr. 22, 30). Mate McAllister duly relieved Pontin at 1750 (Tr. 31) in the vicinity of the Tappan Zee Bridge (Tr. 115). At that time, the weather was clear, the flotilla was proceeding northbound in the Hudson River, the towing cables were secure and events were proceeding without incident (Tr. 12). The seven-inch Decca radar was operational and in use (Tr. 33). The loran was also in use, being employed to check the flotilla's speed over the ground (Tr. 33–34).

13. Prior to the time that Mate McAllister relieved Captain Pontin he examined the charts to be used during his watch for about twenty to thirty minutes. (Tr. 118; Exhs. 100, 101). However, he did not plot courses or compute distances. Nor did he inform the captain that he had not piloted in the vicinity of Diamond Reef. Captain Pontin did advise the mate to watch his speed around Magazine Point as there was a difficult turn in the river. Magazine Point is about twelve miles south of Diamond Reef. The captain did not advise the mate about navigating by Diamond Reef. However, the mate did not slow down either at Magazine Point or at Diamond Reef. (Tr. 206, 213).

14. South of Danskammer Point and Diamond Reef and in the vicinity of the Newburgh Bridge Mate McAllister made a security call. The function of a security call is to advise and identify traffic in the area. There was no response to this call. Newburgh Bridge is approximately three and three-quarter miles from Danskammer Point.

15. The flotilla proceeded in mid-river north to a position estimated by the mate to be approximately four-hundred yards

abeam of Danskammer Point (Tr. 46–47). From this position McAllister could ascertain whether any traffic was approaching from the north. There was none.

16. Approaching Diamond Reef, McAllister was using either the one and one-half or three-mile range on the radar (Tr. 193). That particular night the visibility was clear, with light variable winds, which did not affect the navigation adversely. The tug was proceeding at nine knots through the water with a one-knot flood current, making good a speed over the ground of ten knots (Tr. 50). There was no ice.

17. The radar was operating and clearly showed the shoreline (Tr. 194). The radar also showed from a distance of one and one-half miles away the buoy marking Diamond Reef. Visually the buoy was seen from half a mile away (Tr. 246–47).

*The Chart and the Geographical Area*

18. The Hudson River in the relevant area runs generally in the north-south direction and is about 620 yards wide (Exhs. 100, 101 (charts 12343 and 12347)).

19. On chart 12347 the Diamond Reef area is shown on the lowest left-hand panel of the chart, about one mile north of the beginning or lower part of the chart. About eight tenths of that same area is shown at the same scale of 1:40,000 on the preceding chart No. 12343 (Exh. 100). Both charts show Danskammer Point and an area some 400 to 500 yards to the south of it (*see* Exhs. 100 and 101).

20. Most of the river has deep water with depths varying from thirty-six to seventy-five feet. Diamond Reef is a natural obstruction near the center of the river. It is charted as being about 100 yards wide with a five-feet sounding inside a three-fathom or eighteen-foot curve, indicated by dots surrounding a blue-tinted area on the chart. It is located just opposite Cedarcliff on the left or westerly side and New Hamburg on the right side of the Hudson River when proceeding north (Exh. 101 (chart 12347); Tr. 290–92). The words "Diamond Reef" are printed on the chart next to the blue-tinted area denoting the reef.

21. The chart shows that between the westerly edge of the reef, depicted on the chart with blue tint, and the westerly shore there is a channel of good navigable water for a distance of at least 300 yards (*see* Exhs. 101 and VV). Also, between the easterly edge of the reef and the easterly shore there is another channel of good navigable water approximately 200 yards wide but not as wide as the channel on the westerly side (Exh. 101; Tr. 290–92). A survey of the reef by the Army Corps of Engineers ("ACOE") in 1979 shows that the east-west distance of the reef at a twenty-foot curve is 250 feet (*see* Exhs. X and VV). The distance from the twenty-foot depth curve to the westerly shore, measured on Exh. VV, is 930 feet.

22. Diamond Reef is one of three natural reefs in the middle of the Hudson River in a six-mile stretch of the river between Cedarcliff and Blue Point (*see* Exh. 101 (chart 12347)). All three reefs are marked with a single floating aid to navigation, a buoy to the south of each reef (*id.*). Each floating buoy is attached to a concrete sinker with a chain, the length of which is several times the depth of water in which the buoy floats. This permits the buoy's ground tackle to withstand the pressures of the current and wind and, in wintertime, the ice. This relationship between chain length and water depth is well publicized to the maritime world by statements in the Coast Pilot, the Light List, as well as notations on the relevant charts, Notices to Mariners, and the Code of Federal Regulations. Because the waters of the Hudson River freeze in winter, during that season the lighted buoy is replaced with an unlighted buoy (Exh. DD (Coast Pilot); Exh. CC (Light List)).

23. Notations on both charts, Exhs. 100 and 101, contain references to the Coast Pilot and Light List (*see* Note A and "Warning" on the charts). The Light List (Exh. CC) informs the mariner that during winter months the Diamond Reef buoy is replaced by an unlighted nun buoy, and contains several cautionary warnings regarding buoys. This information and the warnings are also contained in 33 C.F.R. § 62.25–55. The Coast Pilot (Exh. DD) on

page 270 describes Diamond Reef and states that the west side of the river should be favored.

24. The Diamond Reef buoy was painted with red and black stripes, with the uppermost being red (Tr. 662–66; Exh. CC (Light List)). This designated the buoy as a "bifurcation" or "obstruction" buoy, signifying a danger to navigation or an obstruction in the channel, with a preferred channel to be passed in accordance with the upper stripe. Since the upper stripe was red in this case the buoy would be left to starboard by an upbound vessel (Tr. 292).

25. Moored to a chain that permits the buoy to move with the tidal current, the buoy sinker was positioned approximately 100 feet to the south of and to the center of the shallower part and near the twenty-foot depth curve of Diamond Reef (cf. Exhs. 101 and VV). The sinker was five feet square and three feet thick and weighed approximately 12,500 pounds. It was made of concrete. Because the current in the Hudson River runs north and south, the buoy would move generally in a north-south direction, with a very minimal east-west movement of a few yards (Tr. 582–83, 703–10, 795–96; Exh. VV; Exh. 200 ("Kinner dep.") 76).

26. The positioning methods used by the Coast Guard in 1982 and 1983 consisted of the use of a sextant in conjunction with computer calculated angles, a method that permits much more accurate positioning of the buoy than could previously be done by a mariner. However, absolute accuracy still is not possible. Therefore, internally, the Coast Guard has assigned to each buoy a target radius. The geographic center is the assigned position of the buoy's sinker inside the circle, as indicated by the buoy's approximate position shown on the chart (Exh. VV; Tr. 557–89).

27. The survey by the ACOE which is an enlargement of the area depicted on the navigational chart, shows that between the westerly shore of the Hudson River off Diamond Reef and the assigned position of the sinker of the buoy is a distance of 1,080 feet (Exh. VV). The distance from the same westerly shore to the westerly extremity of the twenty-foot depth curve of Diamond Reef is 930 feet.

28. The navigational chart (Exh. 101) which the mate claims he was using, shows a safe distance of approximately 300 yards between the dangerous part of the reef and the westerly shore, and as much as 450 yards between the westerly shore of the river and the easterly extremity of Diamond Reef as charted. It also shows the buoy to the south and in the center of the river—the buoy's approximate position depicted by a circle indicating that the location is approximate (Exhs. 101 and UU).

29. All navigators who had been on the river and testified referred to the use of the westerly shore of the river as the guide for the safe passage between Diamond Reef and the westerly shore (Tr. 305–07, 412–14, 418, 776–77, 786; Del Greco dep. 20, 25; Kinner dep. 81–82; Exh. 154 ("Papp dep.") 39–40; see Tr. 673).

30. The records of the Coast Guard, contained in Exh. T, as illustrated on Exh. VV, the survey chart, show that before and after the January 1983 casualty, the Diamond Reef buoy was on its charted position (see Tr. 583–84, 611–12; Exhs. T and VV). Between December 11, 1982, when the winter relief buoy was set at Diamond Reef, and the casualty on January 9, 1983, the Coast Guard did not receive any report of the Diamond Reef buoy being off station (Tr. 613).

31. There are about 400 bifurcation buoys on the navigable waters of the United States, most of which are in the northeastern region of the country. Of these 400 bifurcation buoys, about forty percent mark isolated rocks and sixty percent mark channel bifurcations. Most are in the northeastern United States because there are more isolated rocks here (Tr. 615–16). The marking of an isolated natural obstruction in a river by a single buoy is an internationally accepted practice. Other countries use the same system (Tr. 617).

32. The initial cost for building an ice-resistant structure in the area of Diamond Reef would be approximately $600,000 (Tr. 619–20). The costs for establishing and maintaining a floating aid to navigation (a

buoy) are about $34,000 for the first year and thereafter about $12,000 every year for maintenance (Tr. 619–20).

33. The United States Army Corps of Engineers maintains records of the river traffic on the Hudson River, *inter alia,* between Upper Bay, New York Harbor, and Waterford, the deep water port at Albany. Some of the traffic statistics for the years 1971 to 1974 were before this Court in the case of *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 915 (S.D. N.Y.1977), *rev'd in part, aff'd in part,* 584 F.2d 1151 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). These statistics, compiled and published by the ACOE in an annual publication entitled *Waterborne Commerce of the United States Calendar Year (as appropriate),* showed 245,684 upbound and 250,-233 downbound transits during that four-year period. Of these, 118,435 were upbound tug and barge flotillas, and 166,133 were downbound tug and barge flotillas with drafts of eighteen feet or less. The voyages of vessels and tug-barge flotillas between Upper Bay, New York Harbor, and Waterford, New York, for the thirteen-year period from 1970 to 1982 are tabulated below. Every one of the vessels and/or tug-barge flotillas passed the Diamond Reef area (*see* Pontin dep. 86; Exh. W).

|  | Upbound | Downbound |
| --- | --- | --- |
| 1970 | 102,280 | 102,205 |
| 1971 | 70,586 | 73,081 |
| 1972 | 57,779 | 59,378 |
| 1973 | 61,741 | 62,468 |
| 1974 | 55,578 | 55,306 |
| 1975 | 46,642 | 46,311 |
| 1976 | 39,449 | 39,381 |
| 1977 | 36,844 | 36,475 |
| 1978 | 38,985 | 35,013 |
| 1979 | 33,082 | 28,883 |
| 1980 | 34,800 | 31,112 |
| 1981 | 25,556 | 25,286 |
| 1982 | 26,873 | 23,431 |
| Total | 630,195 | 618,330 |

Thus, in a thirteen-year period, 1,248,525 vessels and tug-barge flotillas passed the Diamond Reef area. Throughout that time the reef was charted, as it was on January 9, 1983, and was marked with one buoy to the south of the reef, as it was marked when Mate McAllister was navigating the tug MARJORIE B McALLISTER in that area on January 9, 1983 (Del Greco dep. 7–8; Tr. 773).

34. On November 16, 1979 the Commanding Officer, Coast Guard Marine Safety Office ("COCGSO"), Albany, New York sent a communication to the Commander of the Third Coast Guard District in which he referred to three recent vessel casualties in the vicinity of Diamond Reef junction buoy. The COCGSO stated that the incidents revealed "a disturbing pattern of navigation on the part of operators of uninspected towing vessels" since in two of the three casualties the operators passed the buoy "within 50 feet" (Exh. 6). The COCGSO also stated that the three cases were probably caused by "buoy hopping" by operators "accustomed to having good water close aboard when passing buoys on the 'right' side," adding that this was "obviously not the case at Diamond Reef." He suggested that the marking of Diamond Reef be re-evaluated (Exh. 6).

35. Only one of the three casualties reported in 1979 involved a northbound vessel leaving the Diamond Reef buoy to starboard. That was the case of the TB KATHERINE TILTON, which grounded on Diamond Reef on August 27, 1979, having passed the buoy within fifty feet of her starboard side. Of the other two casualties, one involved a loss of steering rather than a navigational error and the other involved a ship forced off course to the east of the buoy by another vessel.

36. Subsequent correspondence occurred between the Commander of the Third Coast Guard District, COCGSO, and the Commanding Officer of the Coast Guard Cutter RED BEECH (Exhs. 1, 2, 3, 5, 7). Among the suggestions made by the latter was to establish another lighted buoy directly to the north of the present buoy on the opposite side of the reef to alert vessels approaching from the north. With respect to the present buoy it was suggested that it be relocated approximately 100 yards to the west and its color changed to solid red with a quick-flashing red light. In addition, it was suggested that an orange and white horizontally-banded, special-purpose

buoy be established, presumably at the location of the present buoy.

37. A further suggestion was that a red, radar-reflective nun buoy be stationed on the western extremity of the reef, a black radar-reflective can buoy on the eastern extremity, and at the northern, upstream, end of the reef an unlighted junction buoy with horizontal bands, the top band to be black.

38. On February 19, 1980 the Commander of the Third Coast Guard District, wrote to COCGSO advising that he and his staff had "reached agreement that the present system is the most logical one." It was believed that "the addition of any other buoys in this small area would:

    a. Tend to confuse the mariner.

    b. Confine traffic to one side or other of the reef when there is good water on both sides.

    c. Possibly set a precedent for other areas being similarly marked. (Two of which are just to the north of Diamond Reef)."

Exh. 7.

39. During the period 1975 through 1982 inclusive the only reported grounding on Diamond Reef due to navigational error was that of TB KATHERINE TILTON on August 27, 1979. Prior to 1975 there was a reported grounding in 1974 due to the buoy being off station. There were no further groundings until that of the Barge McALLISTER 80 on January 9, 1983.

*The Grounding of Barge McALLISTER 80*

40. The flotilla arrived off Danskammer Point sometime after 2100. The mate and the deckhand had been on duty since 1800. The distance from the flotilla's position and Diamond Reef was eight-tenths of a mile when the mate changed his heading to pass to the west of the reef.

41. The tug's seven-inch Decca radar screen was set on either the one and one-half- or three-mile range (Tr. 124), and could pick up objects that were as close as 100 feet (Tr. 127–29). With the radar set at these ranges, Mate McAllister could also measure the flotilla's distance from shore within an accuracy of twenty-five yards (Tr. 131). Similarly, the radar could measure the distance to objects 100 yards and 150 yards away with the same degree of accuracy (Tr. 131–32).

42. By radar, Mate McAllister first observed the Diamond Reef buoy from a distance of one and one-half miles away. Visually he saw it from a distance of one-half mile away. With either radar scale setting, when the flotilla was one and one-half miles from the buoy, the radar scope also showed both shorelines of the river. Thus, the distance between the buoy and the shoreline was displayed on the tug's radar screen at all material times.

43. Approaching the Diamond Reef area, chart 12343 (Exh. 100) was in front of Mate McAllister, and chart 12347 (Exh. 101), which also shows Diamond Reef, was behind him (Tr. 111–12). There was enough light for him to read his chart (Tr. 112–13), although it is not clear whether this illumination came from lights on shore or the moon (*see* Tr. 112–13). The lights in the wheelhouse had been extinguished but he had a flashlight at hand. The actual charts Mate McAllister used that night have not been produced, and he does not know where they went (Tr. 118). Similarly, the accident report prepared by McAllister has never been produced (Tr. 225–26).

44. The tide was at flood, and was nearly at the end of the incoming cycle. The flotilla was continuing at a speed of ten knots over the ground (a speed of nine knots through the water plus a one-knot current) or approximately 1000 feet per minute, there being 6080 feet in a nautical mile (Tr. 129–30). Thus, the navigator of the MARJORIE had a period of at least six minutes to gauge the distance between the westerly shore and the buoy when he was one mile away. From a distance of one and one-half miles the time available was at least ten minutes. There was no other traffic in the area.

45. When the flotilla approached Diamond Reef, deck-hand Woodward had been performing chores below for the last half hour or hour, and had brought up coffee just before the accident (Tr. 218–19). He was not watchstanding.

46. After turning to port off Danskammer Point, Mate McAllister does not recall his position or course (Tr. 153–54) nor does he recall whether he used the searchlight to illuminate the buoy or the western shoreline (Tr. 196). If he had been 400 yards abeam of Danskammer Point this would have required a change of course approximately twenty to thirty degrees to the west.

47. Mate McAllister testified that it was his intention to pass the obstruction buoy by two or three times the width of the barge, i.e. 140–210 feet (Tr. 55). He relied on the charts but not solely. He testified that "[y]ou know not to rely solely on buoys" (Tr. 58). He said that he also relied on the land configurations, explaining that "[t]hey are absolute" (Tr. 58). As he further testified: "I was relying on the radar to actually show me where the shoreline actually was" (Tr. 59). He did not utilize the auto pilot to enable him to use navigational techniques to ascertain his position (Tr. 142).

48. The mate also testified that the distance between the buoy and the western shore was approximately 400 yards, and that he was trying to split the distance and stay 200 yards off the western shore, which he considered the most reasonable approach. He determined by radar after the grounding, that he was 300–400 yards off the westerly shore.

49. At approximately 2150 the flotilla grounded on Diamond Reef. When the grounding occurred, the mate felt vibrations throughout the unit. McAllister took the engine out of gear and the flotilla continued on about one-half a mile. McAllister informed the Coast Guard shortly after the time of the grounding that the buoy was 150 feet off the starboard bow (Exh. YY ("Andrzejewski dep.") 19–21). Captain Pontin noted on the tug's daily record: "2150 mate ran barge aground at Diamond Reef."

50. For Barge McALLISTER 80 to have struck the Diamond Reef on January 9, 1983, the flotilla must have navigated within 150 feet or less of the Diamond Reef buoy, approximately 900 feet away from the westerly shore (see Exhs. 101 and VV).

51. Damage from the grounding was confined to the starboard side of Barge McALLISTER 80, which would indicate the vessel struck on the western edge of the twenty-foot curve of the reef (Exh. VV).

52. Plaintiff McAllister's Manager of Seagoing Personnel and Loss Prevention, Cesare Del Greco, stated in a letter of admonition to Mate McAllister dated January 21, 1983, that this striking of the well-charted and well-marked reef was solely due to the mate's negligence. This was an assessment of plaintiff's managerial official charged with investigating and taking of appropriate action whenever "any incident ... occurred on our vessels." (Exh. Q; Del Greco dep. 4). Del Greco had navigated up and down the Hudson in the area of Diamond Reef for ten years, and had taken flotillas past Diamond Reef "hundreds of times" without an accident. During that time the reef was marked with a single buoy, just as it was in 1983 (Del Greco dep. 6–10, 25). Mate McAllister was suspended from duty until March 1983.

53. At the subsequent Coast Guard license hearing, Mate McAllister, during his counsel's questioning, admitted his culpability in response to the following question:

Q Why don't you tell us what you think the impact of this thing has been upon yourself?

A Well, it's created some anxiety. The incident happened, it created a lot of anxiety. As far as performing at a level which is demanded by me by my peers and fellow employees, I felt that I let them down and my family down trying to explain how this incident happened, and then trying to go forth from that incident and continue to working in a professional manner to an even more higher degree and trying to prove myself, you know, that I am a competent navigator and professional in this business and trying to move forward, maybe into pilotage and so on and so forth, as possibly raising doubt as to whether I should continue in this.

54. With a safe channel of approximately 900 feet or 300 yards wide available to him, McAllister did not adequately use the tools and aids to navigation available to him (Del Greco dep. 18–22; Tr. 777, 780, 808–10).

55. The striking of the reef was caused by the inexperience and negligence of the Mate A.J. McAllister.

## DISCUSSION

### A. *Jurisdiction*

■ In this action, plaintiffs have brought suit against the United States under the FTCA and the SIAA. Defendant argues that this court lacks jurisdiction because of the discretionary function exception to the FTCA.

The exception, as stated in the FTCA, releases the United States from liability on claims:

based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1983) (emphasis added).

The United States argues that the decision to mark a known obstruction to a navigable channel, and what type of marking to use, are discretionary determinations. Indeed, the Coast Guard is vested with the sole authority to mark navigational obstacles. The controlling statute states in relevant part:

In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels and aircraft, the Coast Guard *may* establish, maintain and operate:

(1) aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States....

14 U.S.C. § 81 (1983) (emphasis added).

In *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("*Varig Airlines*"), the Supreme Court stated "it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exemption." *Id.* at 813, 104 S.Ct. at 2764. The Supreme Court, while recognizing the difficulty, rendered advice on how courts can ascertain on which claims the government may be liable.

First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case....

Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.

*Id.* at 813–14, 104 S.Ct. at 2764–65. The Court added that "Congress wished to prevent judicial 'second-guessing' of legislative *and administrative decisions* grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765 (emphasis added). In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Court held "that the 'discretionary function or duty' that cannot form a basis for suit ... *includes more than the initiation of programs and activities.* It also includes determinations made by executives or administrators in *establishing plans, specifications or schedules of operations.*" *Id.* at 35–36, 73 S.Ct. at 967–968 (emphasis added).

With only one exception, the discretionary function exception to the FTCA has been incorporated into the SIAA by all of the circuit courts that have considered the issue. *See, e.g., Wiggins v. United States*, 799 F.2d 962, 966 (5th Cir.1986); *Williams v. United States*, 747 F.2d 700, 700 (11th Cir.1984) (adopting district court opinion reported at 581 F.Supp. 847, 852 (S.D.Ga. 1983)); *Gemp v. United States*, 684 F.2d 404, 408 (6th Cir.1982); *Estate of Callas v. United States*, 682 F.2d 613, 620–21 (7th Cir.1982); *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1085 (D.C. Cir.1980); *Bearce v. United States*, 614 F.2d 556, 560 (7th Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44

(1980); *Gercey v. United States,* 540 F.2d 536, 539 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977); *see also Chute v. United States,* 610 F.2d 7, 12–13 (1st Cir.1979) (reaffirming principle after noting Fourth Circuit authority to the contrary), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980). The Fourth Circuit, the lone court to have held to the contrary, *see Lane v. United States,* 529 F.2d 175, 179 (4th Cir. 1975), now appears to have weakened or cast doubt upon its original ruling. *See Faust v. South Carolina State Highway Dep't,* 721 F.2d 934, 939 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *see also Wiggins,* 799 F.2d at 965 (discussing the effect of the *Faust* case on the Fourth Circuit's earlier decision).

Although the Second Circuit declined to reach this issue in *Eklof v. United States,* 762 F.2d 200, 204–05 (2d Cir.1985), the court cited cases that have imported the discretionary function exception to the SIAA, and the overall analysis in the *Eklof* case would not conflict with such an incorporation. *Id.* at 202–04. In fact, several district courts in this circuit have already determined that the discretionary function should be incorporated in the SIAA. *See, e.g., Albinder v. United States,* 685 F.Supp. 45, 46 (S.D.N.Y.1987); *American Global Lines v. United States,* 645 F.Supp. 783, 786 (S.D.N.Y.1986); *Eazor Express v. United States,* 611 F.Supp. 197, 202 (E.D. N.Y.1985). Therefore, if presented with the opportunity to do so, the Second Circuit would quite likely incorporate the discretionary function exception in the SIAA.

Nevertheless, the *Eklof* court held that even if the discretionary function exception were incorporated in the SIAA, it would not extend past the Coast Guard's initial decision to deploy a navigational aid. 762 F.2d at 205. Accordingly, once the Coast Guard decides to mark an obstruction, under the *Eklof* decision the actual method by which it does so may be subject to review. *Id.* at 202–03. As the court in that case stated: "if the Coast Guard had left Diamond Reef completely unmarked, there would be no basis for liability in this case.... But where, as here, the Coast Guard has acted to mark an obstruction or maritime danger, a duty arises to do so in a way that does not create a new hazard." *Id.* at 202. Therefore, the court has jurisdiction over these claims.

### B. *The Merits of Plaintiffs' Case*

Because the grounding in the *Eklof* case occurred on the same reef and involved the same buoy as in this case, plaintiffs have attempted to cast the *Eklof* decision as "a clear and binding blueprint for the legal and factual analysis of the facts" in this case. Plaintiffs' Post–Trial Memorandum at 11–12. Nevertheless, *Eklof* does no more than establish that the discretionary function doctrine does not apply to the actual deployment of buoys, confirming that the district court had to determine whether the Coast Guard violated a duty to use reasonable care in marking Diamond Reef. 762 F.2d at 204. Contrary to what plaintiffs might wish the court to assume, however, the *Eklof* decision did not establish whether there was any negligence or proximate cause regarding the specific manner in which Diamond Reef was marked. As the court stated: "Whether the Coast Guard acted reasonably under the circumstances of this case has yet to be determined.... [T]here remain material questions of fact to be resolved." *Id.*

Since it was only reversing a grant of a motion to dismiss the complaint, the *Eklof* court did not pass on the merits of the allegations themselves. For example, it merely noted that "the *complaint* [in the case] can be read as stating a claim for mispositioning the buoy." *Id.* at 203 (emphasis added). In the case before me, plaintiffs have further alleged that the buoy was off station. Even so, I am satisfied that the facts establish that the buoy was on station within its charted position. *See* Defendant's Exh. VV. The *Eklof* court also discussed evidence that it suggested might bear on the reasonableness of the Coast Guard's placement of the buoys. It noted that in an internal report discussing the positioning of the Diamond Reef buoy "the Coast Guard was aware of the

practice of 'buoy hopping', where mariners 'are accustomed to having good water close aboard when passing buoys on the "right" side', or, as a nautical maven would put it, when leaving buoys to port." 762 F.2d at 203. The court continued, however, that "[t]he Coast Guard was under a duty to place the buoy in such a position that mariners *who follow normal practice* would not be enticed to enter upon a danger that otherwise might have been avoided." *Id.* (emphasis added).

■ In this case, the mate was a professional mariner, who is held to a higher standard of navigational competence than a recreational boater who might regrettably be expected to follow such inadvisable practices as "buoy hopping." *See* Note, *Preventing Merchant Vessel Groundings by Enforcing a Professional Mariner Standard of Care*, 63 Wash.L.Rev. 371, 382–84 (1988). Accordingly, the "normal practice" that must be considered in this case is that of reasonable professional mariners who must comply with recognized levels of performance, not inexperienced or "unwary" mariners. *See Hercules Carriers, Inc. v. Florida Dep't of Transp.*, 768 F.2d 1558, 1565–73 (11th Cir.1985); Note, *supra*, at 386–92.

■ The evidence at trial reveals that the Coast Guard's method of marking Diamond Reef was reasonable. Plaintiffs unsuccessfully attempt to prove otherwise with various arguments. First, they allege that the 1:40,000 scale of the charts employed by McAllister was inadequate. The scale of charts ranges from about 1:2,500 to 1:14,000,000. Coastwise charts usually have a scale of 1:150,000 to 1:600,000 while harbor and small waterway charts generally have scale ranges larger than 1:50,000. *American Practical Navigator* 109–10 (Bowditch ed.1977). These charts are published by the U.S. Department of Commerce National Oceanic and Atmospheric Administrator. A chart covering a relatively large area is called a "small-scale" chart and one covering a relatively small area is called a "large-scale" chart. The scale of a chart is the ratio of a given distance on the chart to the actual distance

which it represents on the earth. *Id.* The scale, of course, dictates the area to be covered. For a voyage from New York to Albany three charts were necessary: chart 12343, New York to Wappinger Creek (Exh. 100); chart 12347, Wappinger Creek to Hudson (Exh. 101); and chart 12348, Coxsakie to Troy (Exh. EE). If the scale of the chart were changed from 1:40,000 to 1:20,000 this would in effect double the number of charts to be carried for this one short voyage.

The pilot McAllister testified that he was aware of the scale of the charts he was using and that he took account of the "limitations" of the chart in determining the width of the reef and in determining the correct distance from the buoy at which to pass. Tr. 184–85. At the trial, McAllister, employing dividers or a compass, was able to make various measurements on the 1:40,000 scale chart with dispatch and accuracy. I conclude that the scale of the navigation chart was not a factor in the instant case, and did not operate to create a trap for the pilot McAllister. Indeed, he spent only twenty or thirty minutes examining the charts before he took over at the helm. Tr. 118. As part of the curriculum at Fort Schuyler he had studied charts, "all the particulars of charts, the various information, what it affords a navigator." Tr. 34.

Plaintiffs' further attack on various publications such as the U.S. Coast Pilot (Exh. DD) and the Coast Guard Light List (Exh. CC) as inadequate and misleading is far from convincing. Since there is no showing that McAllister relied on anything in the publications in connection with his navigation on January 9, 1983, the necessary causative factor is absent.

Plaintiffs also argue that chart 12347 (Exh. 101) inadequately or mistakenly identifies the reef. However, McAllister never testified that he was misled by the chart. The reef is outlined on the chart and tinted blue, as is all shallow water. The number "5" is within the tinted area as are black dots, which indicate the least depth and the extent of the reef. To the west, or left, of the tinted area, are the words DIAMOND REEF. Below the tinted area is a magenta

disc indicating a light. The magenta disc is superimposed over a circle indicating the approximate position of the buoy. The buoy itself is indicated by a diamond shape the top of which is red and the bottom black. To the east, or right, of the reef appear the letters RB, which identify the buoy as a red and black striped buoy with the red stripes uppermost advising the navigator that the preferred channel is reached by leaving the buoy to starboard. Finally, beneath the buoy symbol are the letters I, QK, FL indicating an interrupted quick flashing light. Below these letters is the letter D, the buoy's identification, which is also painted on the buoy. On January 9, 1983 the light buoy had been replaced by an unlighted buoy similarly colored. This was known to McAllister, it being the standard practice temporarily to remove light buoys which might be damaged by ice during the winter months.

The markings referred to above were certainly not misleading or inadequate so far as McAllister was concerned. Granted that he was more experienced at the trial than at the time of the casualty he, as a professional mariner, was expected to perform at the level of a mariner with sufficient experience to pilot a barge on this type of trip. He was able at trial, using dividers, to measure the reef accurately and to determine various distances from it. In any event, the words Diamond Reef printed on the chart adjacent to the obstruction buoy would be sufficient to warn a literate person that a hazard lay ahead and to exercise extreme caution.

Plaintiff's arguments concerning the adequacy of the charts are unpersuasive. Perhaps the United States could make available charts of a larger scale. However, it is only if the mate had been misled by the small-scale chart in this case that there could have been causation. Despite the small-scale there is no evidence that the charts were inaccurate. Indeed, the mate had all the information on the chart to navigate successfully past Diamond Reef and he had already successfully navigated in a more complicated area around West Point prior to reaching Diamond Reef. Admittedly he considered the small-scale of

the chart when he estimated his course to pass to the west of the reef. As for the other publications, there is no evidence that the mate relied on anything false or misleading in the Coast Pilot or Light List which caused him to go aground. Indeed, there is no evidence that he consulted either publication prior to taking the helm on January 9, 1983. Without reliance there can be no causation and without causation no liability. *See Caraballo v. United States*, 830 F.2d 19, 23 (2d Cir.1987); *Tug Ocean Prince v. United States*, 436 F.Supp. 907, 922, *aff'd in part, rev'd in part*, 584 F.2d 1151 (1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

Plaintiffs make two further charges against the Coast Guard, the first being the Coast Guard's claimed "callous indifference" to the public in failing to take action in 1980 after three groundings occurred on the reef in 1979. These three casualties involved:

(a) Barge INTERSTATE 35 on January 31, 1979, which was forced aground on the *easterly* side of the reef by a down bound vessel.

(b) Barge KATHERINE TILTON in tow of the Tug FRANCES TUREMCO on August 27, 1979, while bound upriver grounded while passing the obstruction buoy too closely on the starboard side due to a navigational error.

(c) On October 21, 1979 the tug towing Barge C–5 while proceeding down river lost steering and grounded the barge 100 feet north of the buoy on the northern part of the reef.

In his November 16, 1979, letter, which was written shortly after the last incident, Captain P.J. Bull, the COCGSO in Albany wrote that the casualties revealed "either a lack of understanding and/or lack of attention ... of the purpose for" the obstruction buoy "and the blue circle directly north of the buoy symbol on chart 12347." Exh. 6. He went on to "suggest [that] the marking of Diamond Reef be reevaluated with a view toward improving the message which is sent to the mariner if possible." *Id.*

On December 14, 1979, the Commander of the Third Coast Guard District wrote to C.T. Winfrey, the Commanding Officer of the Coast Guard Cutter RED BEECH enclosing a copy of Bull's letter of November 16, 1979, asking for Winfrey's thoughts on possible solutions. *See* Exh. 1. These solutions, other than doing nothing, included (1) establishing another lighted buoy to the north of the present obstruction buoy to aid mariners approaching the reef from the north, and (2) relocating the present obstruction buoy 100 yards to the west and changing its color to solid red with a quick flashing red light and establishing an orange and white horizontally striped special purpose buoy (presumably in the location of the present obstruction buoy). It was noted that this would restrict the channel to the west side of the reef and reduce the width of the channel at that point to approximately 275 yards.

On December 17, 1979. the Commander of the Third Coast Guard District wrote to the Safety Officer in Albany, advising that his letter of November 16, 1979 was being evaluated, and noting that because of the position of the reef "there are few alternative methods of marking it." Exh. 2. On January 8, 1980, the Commanding Officer of the RED BEECH replied to the Commander of the Third Coast Guard District advising: (a) that a better scale of chart might aid the mariner; (b) that adding a buoy to the north would not keep the downriver mariner from passing close aboard the buoy or reef; and (c) that "[a]lthough it is not our belief that the solution of a problem is to add more buoys to the system, the relocation to the west of the [lighted buoy] and the establishment of the special purpose buoy may be the best solution in forcing mariners away from the reef." Exh. 3.

Thereafter, on January 25, 1980, Captain Bull communicated his recommendation to the Commander of the Third Coast Guard District. Exh. 5. His recommendation was to establish three new aids as follows: (1) a red, radar reflective nun on the western extremity of the reef; (2) a black radar reflective can on the eastern extremity; and (3) an unlighted junction buoy with a top band painted black on the northern, upstream end. According to Bull, this "system of buoys would clearly define the extent of Diamond Reef and make it clear that there is an obstruction and also a viable channel to the east of the reef." Although no mention is made of the present obstruction buoy, it seems clear that it was to remain on its present station so that the reef would, in effect, be surrounded by buoys.

Finally, on February 10, 1980, the Commander of the Third Coast Guard District addressed a communication to Commanding Officer Bull of the Albany Safety Office advising that, after evaluation, he and his staff agreed that the present system of marking was the most logical one. Exh. 7. He stated that it was their "belief that the addition of any other buoys in this small area would:

a) Tend to confuse the mariner.

b) Confine traffic to one side or the other of the reef when there is good water on both sides.

c) Possibly set a precedent for other areas being similarly marked. (Two of which are just to the north of Diamond Reef.)"

Subsequent to the grounding of October 21, 1979, there were no further reported groundings on Diamond Reef until January 9, 1983—the instant case.

In determining whether the Coast Guard acted with "callous indifference" in not adding the additional buoys suggested in the foregoing correspondence it is necessary to consider conditions as they were in 1980 when the decision was made to maintain the status quo and in 1983 at the time of the grounding of the McAllister barge. The decision to mark Diamond Reef with a single buoy south of and at approximately the middle of the reef had been made at least as early as 1947. Prior to 1979 there had been one grounding in 1974 when the buoy was off station. The next casualty due to a navigational error was that of the Barge KATHERINE TILTON on August 27, 1979. Neither of the other two casualties in 1979 involved any relevant naviga-

tional error. Therefore, it would be difficult to conclude that the Coast Guard had shown "callous indifference" to the type of navigational performance that led to this casualty when, at most, only one other pilot apparently had previously made the same mistake as Mate McAllister, i.e. passing too close to the buoy while headed northbound.

Plaintiffs also attempt to use these prior incidents to establish that the reef as marked was unreasonably dangerous. In *Tug Ocean Prince,* however, the district court stated:

> Courts have generally recognized that evidence of a [prior] similar accident has some tendency to establish a dangerous or defective condition at the place in question. Such evidence draws its relevance from the principle that similar causes can be expected to produce similar effects, so that admissibility hinges upon a demonstration that the conditions had been *substantially similar* on all occasions.

436 F.Supp. at 921 (citations omitted) (emphasis added). Again, since, at most, only one of these incidents could arguably have involved any kind of detrimental reliance on the buoy, I do not find them to be particularly relevant and, therefore, do not attribute much weight to plaintiff's argument. In addition, considering that the mate had a functioning radar, which he could have, and should have, used to navigate using the western shore as his target or reference point, plaintiffs cannot claim that better positioning of the buoy would have prevented the grounding. *See American Smelting & Refining Co. v. S.S. Irish Spruce,* 548 F.2d 56, 60 (2d Cir.), *cert. denied,* 431 U.S. 955, 97 S.Ct. 2678, 53 L.Ed.2d 272 (1977).

Plaintiffs, and indeed the *Eklof* court, also suggest that the Coast Guard should have placed a buoy at the western edge of the reef. However, it is clear that McAllister had the western shore line to guide him, that being the preferred "mark." As the district court in *Tug Ocean Prince* observed:

> Reimer had available for navigational purposes both radar, which could take

bearings and ranges on prominent objects (such as Bear Mountain Bridge) and the Con Hook Light, on which a visual bearing could have been taken. Nevertheless, he strayed west of the channel looking for an obscured buoy. The premise that the presence of additional aids might have assisted in correcting his navigational error would be a "fortuity [having] nothing to do with proximate cause. Liability must rest on [a] causal relationship between the negligent aspect of the conduct and the harm resulting from the conduct."

436 F.Supp. at 922 (*quoting American Smelting,* 548 F.2d at 60). Mate McAllister's actions are analogous to those of the pilot in *Tug Ocean Prince.* He failed to make proper use of the other navigational aids available to him, and failed to post a lookout even though he had little experience on these waters.

Plaintiffs finally attempt to prove that the buoy *could* have moved over one hundred feet to the east of its charted position because with a one hundred and twenty-five foot chain between the buoy and its sinker the "watch circle" of the buoy would have had a radius of approximately one hundred twenty-five feet. Tr. 690. To this plaintiffs add the *diameter* of the charted circle, i.e. approximately two hundred and fifty feet or a total of three hundred and seventy-five feet and for good measure an additional seventy-five feet to cover variation from the charted circle for a grand total of four hundred twenty-five feet. On the basis of such figures plaintiffs argue that the buoy could have been off its charted position by some four hundred twenty-five feet, which is longer than the width of the reef. In so doing the plaintiffs, in effect, assume a placement of the sinker beyond the limits of the target area and the plotted position shown on the chart. They also disregard the physical elements involved.

There are practical limitations in placing and keeping buoys and their sinkers in exact geographical locations. Although the Coast Guard has improved its methods of positioning a sinker, the sinker is low-

ered by a vessel navigating frequently in proximity to shallow water. Accordingly, a target radius or goal is set for a target circle within which the sinker would be placed. In the instant case the radius of the target area was forty-eight feet. Tr. 579. Outside of the target area is a larger circle called the charted position. The charted position circle has a radius of seventy-five feet which includes the radius of the inner target circle. The radius of the charted position circle represents the size of the circular chart symbol for the buoy position on a scale of one to 40,000, i.e. the scale of the chart. In other words, the chart symbol has a diameter of 1.15 millimeters which on a one to 40,000 ratio comes out to 151 feet or a radius of approximately seventy-five feet.

The final theoretical circle is what has been referred to as the "watch circle" at the center of which is the buoy sinker. This circle is the path a theoretical buoy would follow if it circled the sinker with the anchor chain stretched taut. In order to determine the radius of such a circle one applies the Pythagorean theorem, which holds that the sum of the squares of the sides of a right triangle is equal to the square of the hypotenuse. Using a cable length of 135 feet and a water depth of 50 feet the watch circle radius would be 125.-39 feet. Tr. 690. Assuming that the sinker was misplaced to the edge of the watch circle corresponding to the charted position, this would only increase the watch circle radius by seventy-five feet. Accordingly, the widest possible watch circle would have a radius of approximately 200 feet, or half of plaintiffs' extreme 400–plus feet.

However, deceptive as figures may sometimes be, the physical fact remains that the current's ebb and flow is on a N/S axis at approximately one knot per hour. It would take at least a five-knot current to extend the 135–foot anchor chain fully. Plaintiff has made no showing whatsoever that the current at Diamond Reef flows from west to east, or vice versa, across the Hudson River. Moreover, in view of the unlikelihood that the sinker moved across the bottom of the river between December 11, 1982, and January 18, 1983, I believe that the sinker was actually in position midway between the probable location for those dates and well within, if not at, the center of the target area. Tr. 598. Furthermore, with no ice and a current less than one knot it is very doubtful that the buoy was watching beyond 100 feet of the sinker. On the flood it would have been north of the sinker and slightly to the east, within its charted position. In any event, McAllister was aware that buoys had a watch circle and made his navigational decisions accordingly.

Finally, as purported evidence that the buoy was actually far to the east of its charted position, plaintiffs offered several photographs taken from a helicopter by McAllister and an attorney the morning following the casualty. When these were offered in evidence the court advised plaintiffs that they would not be received to establish the location of the buoy. Tr. 71; see Exhs. 12–23 (incl. 19A), 28. In any event, the photographs are in no way persuasive to support plaintiff's claim that the buoy was to the east side of the reef. The areas outlined on the photographs by the mate—which were intended to reveal the location of the reef by purported disturbances on the surface of the water—are no different from other areas in the photographs and are noticeable primarily because of the ink outline placed by the mate. Furthermore, we are not informed as to the hour, weather conditions, or state of the current at the time the photographs were taken. The depth of the water exceeded ten feet over all but a small area, so that with a current of little more than one knot the effect of the reef on the surface would hardly have been noticeable.

Striking a charted obstruction such as a reef raises a presumption of negligence. *Afran Transport Co. v. United States,* 309 F.Supp. 650 (S.D.N.Y.1969), *aff'd,* 435 F.2d 213 (2d Cir.1970), *cert. denied,* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). In addition, piloting on inland and coastal waters differs greatly from navigation on the high seas where celestial and electronic navigation replace landmarks, buoys and other visual aids to navi-

gation. Piloting a tug flotilla is unusually burdensome since, due primarily to space and economic limitations, the captain or mate on watch is both navigator and helmsman in the small wheelhouse. The task of the river pilot, whether on a tug boat or other river vessel, was well-described by the Supreme Court over 100 years ago in *Atlee v. N.W. Union Packet Co.*, 88 U.S. (21 Wall.) 389, 396, 22 L.Ed. 619 (1874), when the Court stated:

> [T]he pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel.... He must know where the navigable channel is, in its relation to all these external objects, especially in the night. He must also be familiar with all dangers that are permanently located in the course of the river, as ... sandbars [and] sunken rocks.... All this he must know and remember and avoid.

A little more than ten years ago the Court of Appeals for this circuit held that these standards set forth in *Atlee* and in *The Lady Pike*, 88 U.S. (21 Wall.) 1, 22 L.Ed. 499 (1874), "are still viable ... for inshore piloting and are applicable here." *Tug Ocean Prince*, 584 F.2d 1151, 1157–58 (2d Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). Yet plaintiff-shipowner placed in charge of a 445–foot flotilla loaded with approximately 8100 barrels of gasoline a mate not acquainted with the river, who had never before navigated in the area.

Furthermore, there was no lookout stationed on either the tug or the barge. While a tug alone does not require a pilot on the Hudson River, the Coast Pilot still, for example, warns that "all except small boats are advised to take pilots" when navigating the Hudson north of Diamond Reef. Exh. DD at 271; *see* N.Y. Navigation Laws § 89–a(1) (McKinney Supp.1989). Captain Pontin had a Hudson River pilotage endorsement; Mate McAllister did not. Tr. 13. While the tug's gross tonnage is 189 and technically no pilot was required for her, when the tug is made part of an integrated unit in a flotilla 445 feet in length, it is certainly not a "small boat" and the

shipowner should not have sent out the flotilla manned by only one person not experienced enough to navigate in the particular area involved. *See Tug Ocean Prince*, 584 F.2d at 1157. Considering the inexperience and overconfidence of the pilot, it is not necessary to rely on the presumption since there is ample evidence of his negligence throughout the record.

■ Furthermore, the failure to have a lookout posted constituted a violation of a statutory duty, which shifts the burden to plaintiffs to establish that this violation *could not* have been a cause of the grounding. *See* 33 U.S.C. § 2005 (1982); *Tug Ocean Prince*, 584 F.2d at 1160. Plaintiffs have not met this burden.

In the course of the trial, Mate McAllister was asked what he relied on as he approached the western channel by Diamond Reef:

Q. Would you list for the Court and counsel the factors that you relied upon in making your navigational decisions on that night, at that point.

A. Could you repeat that?

Q. Sure. I want a list of those factors that you relied upon, those aids or assistances or input.

A. The charts I relied on, not solely. You know not to rely solely on buoys. But the land configurations, you can rely on. They are absolute.

The radar was in very good working order. The land configurations came up on the radar as I saw it on the chart. The buoy came up on the radar as I saw it on the chart. Therefore, everything seemed normal.

Q. With that combination of factors, you relied on all of those?

A. I relied on all of those factors.

Q. Can you tell me what the appearance of the western shore of the Hudson River in the vicinity of the Diamond Reef was to you as you approached Diamond Reef on this night?

A. The factors, and I'm sure people will understand this, especially when they navigate this area of the Hudson, *the shoreline on the western shore—*

*taking into account these bluffs once again*—we had a clear sky, I am not quite sure what the stage of the moon was, but *they have a tendency,* especially when the moon is setting in the west, *to cast very dark shadows so that most mariners with my experience would have a very difficult time ascertaining the shoreline.*

It is just too dark and it's—too much of a shadow is cast under these certain conditions.

*So, therefore, I was relying on the radar to actually show me where the shoreline actually was, and as you can see when you approach Diamond Reef, that shoreline is encroaching on you more and more.*

Therefore, visually, *you are sensing that you are getting closer and closer to the shoreline, and it's always been my experience if you get closer to the shoreline you are going to be in some sort of trouble,* also, but it does decrease and it does bottleneck right in there, and with those combination of visual factors and weather conditions, and I believe there was some sort of moon, there was a very noticeable shadow cast onto the river making the visual distance, calculating the visual distance to the shoreline, very difficult.

It is not just in this particular area. It is quite, you know, for most of the distance of this river you have these sort of conditions. It makes navigation, steering difficult.

Tr. 58–60 (emphasis added).

There is no serious question in the court's mind as to the cause of the grounding. It seems clear that it was not due to any misrepresentation or omission in navigational publications or to the scale of the charts involved. All of the credible evidence supports the finding that the buoy was on its charted position and the mate was well aware of the characteristics and movement of the buoy with the current and weather. The cause of the grounding is found in the inexperience of the mate and his fear of running up on the western shore in the shadow of the bluffs in that area.

As the mate approached the passage to the west of the reef he was situated in the wheelhouse over three hundred feet behind the bow of the barge (a distance greater than the length of a football field). He was running the flotilla at full speed or approximately one thousand feet per minute. He had no lookout on the barge to advise him of the proximity of the shoreline. Accordingly, he had to rely on the radar with the seven-inch screen suspended above him from the overhead. Worried by the poor visibility in the shadow of the bluffs he stayed further to the east than he intended and briefly scraped along the western edge of the reef. Of course there is no way to chart his actual course since the original charts were not produced and, in any event, he had charted no courses nor had he plotted fixes of his position from time to time. It is clear, however, that he was not led astray by any buoy but that the shadow under the bluffs and his fear of the shoreline drove him farther to the east than he intended. When he looked at the radar after the grounding he found himself three or four hundred yards to the east of the western shoreline.

In admiralty, as in other cases, the court must apportion damages among the parties in proportion to their comparative fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–1716, 44 L.Ed.2d 251 (1975). To establish liability plaintiffs must prove causation. *See Caraballo v. United States,* 830 F.2d 19, 22 (2d Cir.1987); *Iacurci v. Lummus Co.,* 340 F.2d 868, 872 (2d Cir.1965), *vacated on other grounds,* 387 U.S. 86, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967); *Trueba v. Flota Bananera Ecuadorian Lines, Inc.,* 675 F.Supp. 786, 789–90 (S.D.N.Y.1987); *Margrave v. British Airways,* 643 F.Supp. 510, 512–13 (S.D.N.Y.1986); *Livingston v. Gribetz,* 549 F.Supp. 238, 242 (S.D.N.Y.1982); *Tug Ocean Prince,* 436 F.Supp. at 922. In this case, the cause of plaintiffs' injury was not the placement of the buoy but the

negligent efforts of the mate to navigate around Diamond Reef.

Was the Coast Guard also negligent? In order to make such a determination it is necessary to determine whether, on January 9, 1983, the buoy was located where it was shown to be on charts 12347 and 12343 since if the mate relied on the buoy such reliance was predicated on its charted position. As we have seen, the evidence clearly supports the finding that the buoy was where it was represented as being. Furthermore, the mate testified that this was so. If the buoy was on station, the court must determine (a) whether it was reasonable to locate it at that particular location on January 9, 1983, (b) whether it should have been located elsewhere, or (c) whether more than one buoy or aid to navigation should have been employed. Such determination by the court must be made "by reference to the surrounding circumstances and the knowledge, or lack thereof, on the part of the [Coast Guard.] *Eklof,* 762 F.2d at 204. The Coast Guard in its placing of aids to navigation "must do so *reasonably* in light of what is foreseeable." *Id.* Strict liability does not apply with respect to the placing of navigational aids.

Was it reasonable, on January 9, 1983, for the Coast Guard to mark Diamond Reef with a single buoy as indicated on charts 12347 and 12343? Under all the circumstances and based on the information which the Coast Guard had, the answer can only be in the affirmative. The buoy had been so positioned since 1947, over thirty-five years ago. During the thirteen years prior to 1983 almost one and a quarter million vessels and tug-barge flotillas passed through the Diamond Reef area and yet there were only four reported groundings, one in 1974 when the buoy was admittedly off station and the three groundings in 1979 already discussed hereinbefore, only one of which related to the positioning of the buoy. In other words, there was only one casualty in the thirteen years prior to January 9, 1983, that could be considered as relevant to the positioning or character of the buoy. Nor is the court aware of any complaints to the Coast Guard by pilots or others navigating in the area as to the charted position of the buoy or suggesting a change in its position or the addition of other aids to navigation. The only time that consideration appears to have been given to changing the system of marking the reef was in 1979 and was initiated by the Coast Guard itself, as has been discussed in greater detail hereinbefore. It appears to the court that the decision by the Coast Guard to take no action was the correct one. In marking an underwater obstruction it is sensible to position an aid where it is most likely to be observed by vessels headed toward or to either side of the obstruction, i.e. near the center of, and proximate to, the obstruction.

The argument for not adding a buoy to mark the western edge of the reef is that it inevitably results in a reduction of the width of the channel between the reef and the western shore making simultaneous passage by northbound and southbound vessels hazardous if not impossible. Furthermore, the positioning of a red buoy on the western edge effectively discourages use of the channel off the eastern edge of the reef. Likewise the positioning of a black can buoy off the eastern edge of the reef reduces the width of the already narrow eastern channel.

A further consideration in the location and number of aids to navigation is the fact that ice conditions in this part of the Hudson River in wintertime are severe as indicated in *Ocean Prince.* Buoys are subject to dragging or submersion by ice floes and are difficult to maintain and unlighted buoys are substituted for lighted buoys during the winter months. Although in the instant case there was no ice, in its planning and decision making, the Coast Guard must consider the extra hazard involved in adding buoys or in positioning them. I therefore conclude and find that the Coast Guard acted reasonably in originally positioning the obstruction buoy where it was on January 9, 1983 and further find that it acted reasonably in 1980 by conducting a study of such position in light of the 1979

incidents and in determining that no change in the system of placing the navigational aids was warranted. There having been no reported incidents after 1979 until January 9, 1983 the Coast Guard was not negligent in maintaining the buoy on its charted position at the time of the grounding herein. The court is aware that there were groundings on Diamond Reef subsequent to January 9, 1983, e.g. the grounding of the tanker RELIABLE on June 16, 1983 (the incident involved in *Eklof*) and that subsequently there were changes made in the marking of the reef. However, the court's findings as to the propriety of conduct of the Coast Guard is determined on circumstances and the knowledge of the Coast Guard as of January 9, 1983.

## CONCLUSION

This is not a case where a buoy was not on its charted position. Nor is it a case where the pilot was confused or misled by government publications or by the scale of the charts. The pilot relied, as he should have, on the fixed landmarks, i.e. the western shoreline. Due to inexperience which caused him undue concern about the shadows along that shoreline, he stayed too far off and grounded.

The Coast Guard acted reasonably in marking the reef and cannot be charged with contributing in any way to the grounding. Accordingly, there can be no apportionment of damages.

The complaint is dismissed with costs and disbursements to defendants.